RAILROAD COMMISSION OF TEXAS
et al., Appellants,

v.

Dorothy N. MANZIEL et al., Appellees.

No. A–8779.

Supreme Court of Texas.

Oct. 17, 1962.

Rehearing Denied Nov. 21, 1962.

Hart & Hart, Austin, Will Wilson, Atty. Gen., Austin, Linward Shivers and H. Grady Chandler, Assts. Atty. Gen., John E. Taylor, Marshall, for appellants.

Powell, Rauhut, McGinnis, Reavley & Lochridge, Austin, Chilcoate & Clark, Tyler, for appellees.

SMITH, Justice.

This direct appeal is the result of a suit filed by the appellees, Dorothy N. Manziel et al. in the 126th District Court of Travis County, Texas, to set aside and cancel an order of the Railroad Commission of December 12, 1960, permitting the appellants, the Whelan Brothers, to drill and inject water in their Eldridge #11 well located at an irregular spacing on the Whelan Brothers-Vickie Lynn unit 206 feet south of the boundary of the Manziel Estate-Mathis lease in the Vickie Lynn Field, Marion County, Texas. The Railroad Commission was the original defendant in this action; the Whelan Brothers intervened and aligned themselves in defense of the Railroad Commission's order. For convenience the parties will hereinafter be referred to as the Whelans, the Manziels and the Commission.

In addition to alleging irregularities in connection with the Whelans' application for the permit, the Manziels attacked the

Commission's order on the grounds that it would cause waste, that it would result in the confiscation of the Manziels' property, that the permit was not necessary to protect the correlative rights of the Whelans', and that the order was in violation of the Commission's own rules.

After trial, the District Court entered a judgment cancelling the order allowing the Whelans to inject water at the irregular location, enjoining its enforcement and enjoining the Whelans from injecting water in their Eldridge #11 well under said order. The judgment of the District Court has been brought to this court for review under Art. 1738a, Vernon's Texas Civil Statutes, and Rule 499–a, Texas Rules of Civil Procedure.

The Vickie Lynn Field was discovered in February, 1956, and field rules were established by the Commission, effective August 20, 1956. The rules provide for 80-acre production units with the wells to be located on that unit 660 feet from lease lines. A well located 660 feet and more from lease lines is referred to as being at a regular location while a well located at a less distance is said to be at an irregular location. All the wells in the field were drilled according to this plan except the Manziel-Mathis lease and the well located thereon is spaced 330 feet north of the adjoining Whelan unit.

At the time of the trial, the Vickie Lynn Field was divided into three separate and distinct areas. The Whelans' property is referred to as the Whelan Brothers-Vickie Lynn Unit, and includes about 900 productive acres on which 11 producing wells have been drilled. The Manziels are the only other operators in the field and they control two units, the largest of which is referred to as the Manziel Estate-Whelan lease; it comprises about 1,135 producing acres and has 10 wells. The other unit is made up of three leases sometimes collectively referred to as the Hollandsworth leases (separately known as the Mathis, the Combs, and the Coleman leases), which were not acquired by the Manziels until 1960. The Mathis lease contains 40.36 acres, with one well; and the Combs and Coleman leases each include 80 acres, with one well on each lease. For a better understanding of the relative size and location of each of the units involved, a plat drawn from Exhibit "A" is attached on opposite page.

The field has not been unitized as a whole, but the Whelans have unitized all of the properties of which they are lessees; however, no unitization agreement has been made between the Whelans and the Manziels. The Manziels have not unitized all of the properties under their control, and the situation in the Vickie Lynn Field is further complicated by the fact that the Manziels have a waterflood program on their Whelan lease, and have no such program on their Hollandsworth leases.

The Vickie Lynn Field is in a solution gas drive reservoir, and it is estimated that between 816 barrels to 824 barrels of oil per acre foot were originally in place beneath the field. As production was carried out, the resultant displacement and the failure to maintain adequate pressure has caused the original pressure to drop from 2650 pounds per square inch to the point where it is now of an average of 371 pounds per square inch. The present low pressure in the reservoir means that the remaining oil is "dead," and from the record it appears that the best means of recovery thereof is by the secondary method of waterflooding.

The Hollandsworth leases of the Manziels are located in the northwestern part of the field, and the result of the production from these leases and the effect of the existing water injection programs on the Manziel estate-Whelan lease and on the Whelan Brothers-Vickie Lynn Unit is to push the oil in a northwesterly direction to the Hollandsworth leases. The purpose of the Whelans Eldridge #11 well is to increase reservoir pressure and to minimize the amount of oil which is pushed from their unit, across lease lines, to the Hollandsworth leases, and particularly the Manziel Estate-Mathis lease. Of the Hollandsworth

Exhibit A

Map of Vicki Lynn Field

Marion County, Texas

• Producing Well

⊙ Injection Well

⊗ Eldridge #11 Injection Well

leases, the Manziel Estate-Mathis lease is in the closest proximity to the operations of the Eldridge #11 well of the Whelans, and if the operations can be held valid in relation to the Mathis lease they are valid as to the rest. It is the Whelans' contention that in a situation such as exists in this field their waterflood program must have the dual purpose of efficient recovery of oil from producing wells on their property and the prevention, so far as is possible, of the loss of oil from beneath their lease due to the pushing or drainage of oil to other properties.

If all the oil here in question were located under one tract, it is established that the most recovery from the *entire field* would be through a plan of peripheral flooding around the edges of the field, thus sweeping the oil from the south and southwest down-structure to the north and northwest. In regard to the Whelan Brothers-Vickie Lynn Unit it was shown that the flooding pattern was planned so recovery of an estimated 930,000 barrels of oil from under that lease could be made. The plan was not set up out of a consideration of what pattern would result in the most recovery from the entire field; but rather a plan was used that would result in the most recovery from that *one lease.*

Water injected into an oil reservoir generally spreads out radially from the injection well bore, and it is impossible to restrict the advance of the water to lease lines. For example, water injected into the Manziel Estate #8 well has already crossed the boundary of the Whelans' unit and as more water is injected further encroachment will take place until finally the Whelans' Craver well is drowned out. It is just such an encroachment upon the Mathis lease by water injected in the Whelans' unit that the Manziels seek to prevent.

Regardless of whether the Eldridge #11 well is located at a regular or irregular location any water injection program on the Whelans' unit will cause oil to be pushed from their unit to the Hollandsworth leases. However, it is estimated that four times as much of the oil presently beneath the Whelans' lease will be pushed to the Hollandsworth leases if the injection well is located 660 feet from the lease line as opposed to a 206-foot location. On the other hand, the Manziels-Mathis well would have an estimated life of 32 months if the Eldridge #11 well is placed at a regular location 660 feet from lease lines while if the irregular spacing is used the life of the well would be reduced to 3½ to 8 months depending on the rate of production and injection of the respective wells.

During the primary stage of the field, the Mathis lease enjoyed a great drainage advantage as is shown by the following production figures:

PRIMARY RECOVERY

|  | Acres | Production | % of Oil in Place Before Production | % of Total Field Recovery | Wells |
|---|---|---|---|---|---|
| Mathis | 40.36 | 44,034 bbls. | 1.8%– 2.4% | 5.8% | 1 |
| Remainder of Field | 2,195.00 | 709,006 bbls. | 97.6%–98.8% | 94.2% | 23 |

Now, however, the field is in a secondary recovery stage, and with the location of the Eldridge #11 well at a 206-foot location these additional figures are relevant:

SECONDARY RECOVERY

|  | Acres | Estimated Production | Estimated % of Total Secondary Recovery | # of Injection Wells |
|---|---|---|---|---|
| Mathis | 40.36 | 9,202 | .83% | 0 |
| Remainder of Field | 2,195.00 | 1,090,798 | 99.17% | 4 |

The Commission takes the position that it must have the authority to grant the location of water injection wells to prevent drainage and to protect correlative rights in order to encourage operators to initiate secondary recovery programs. The Commission contends that there would be no incentive to engage in this method of increasing the recovery of oil unless the operator is allowed to use effective methods to prevent oil from being pushed from beneath his property.

The Manziels concede that the Whelans have the right to protect their leases from drainage, and that the Commission has the power to issue reasonable orders to aid such a purpose if it is found to be necessary to drill the well at an irregular location in order to prevent waste or to prevent confiscation of the Whelans' property. However, after conceding this right and power, the Manziels assert that the Commission may not authorize, or the Whelans carry out, a trespass by injected water that will result in the premature destruction of their producing Mathis well. It is asserted that such authorization is violative of Art. 6029(4) Vernon's Annotated Civil Statutes which provides that the Commission is to require wells to be drilled and operated in such a manner as to prevent injury to adjoining property. They further assert that the order permitting the water injection into the irregularly located Eldridge #11 well of the Whelans deprives them of their property without due process of law.

This court has jurisdiction over questions of law presented in a direct appeal from a trial court on the issue of the validity of the orders of the Railroad Commission when they have arisen through the trial court granting or denying a permanent injunction in connection with such order. Art. 1738a Vernon's Annotated Civil Statutes; Rule 499-a Texas Rules of Civil Procedure; Railroad Commission of Texas v. Shell Oil Co., Inc., 146 Tex. 286, 206 S.W.2d 235 (1947).

Regardless of the other questions that may appear, as to matters within the discretion of the Railroad Commission, the ultimate decision of this court, as to the validity of the Commission's orders, must turn upon the application of the substantial evidence rule. Of course, we recognize that it is not the province of this court to substitute itself for the Commission in determining the wisdom and advisability of the particular order in question, but the Court will sustain the action of the Commission so long as its conclusions are reasonably supported by substantial evidence. See: Railroad Commission v. Sterling Oil and Refining Co., 147 Tex. 547, 218 S.W.2d 415 (1949). The record is to be considered as a whole; and being a question of law, it is for this court to determine what is to constitute such evidence. When the orders are supported by evidence establishing that they are necessary in order to prevent waste or to protect correlative rights, the fact that the application of the order has resulted in economic loss to some does not warrant a finding that there has been a deprivation of property without due process of law.

The Commission's orders are presumed to be valid, Article 6042, Vernon's Annotated Civil Statutes, and the burden is cast upon the contestant thereof to show that it is not reasonably supported by substantial evidence. Railroad Commission of Texas v. Magnolia Petroleum Co., 130 Tex. 484, 109 S.W.2d 967 (1937); The Railroad Commission of Texas v. Shell Oil Co., 139 Tex. 66, 161 S.W.2d 1022 (1942). The issue is not whether the Commission came to the proper fact conclusions on the basis of conflicting evidence, but whether it acted arbitrarily and without regard to the facts. Thus, with reference to matters involving the application of a general standard to given facts, the order will be upheld unless the court determines that it is "unreasonable" or "unjust." See: Garwood, "Some Aspects of the Texas 'Substantial Evidence' Rule," 33 Tex.Law Rev. 717 (1955).

The Commission has adopted no field-wide spacing rule for water injection wells, but has made special orders as to each operator desiring to waterflood. On August 15, 1960, over a year after the Manziels had instituted similar operations on their Whelan lease, the Whelans were authorized to conduct secondary recovery operations on their Vickie Lynn Unit. The special order provided:

> "* * * that as the pressure maintenance operation progresses, said operators may expand the injection facilities and may use for injection purposes additional wells * * *; and provided, further, that no injection well location will be approved at or nearer to a lease boundary line than a regular location (660 feet) for producing wells projected to this reservoir unless and until the operators furnish waivers from any such offsetting operators or until evidence that such offsetting operator has been notified and that no protest is made to the Commission concerning such location within ten days after such request for approval of the injection well location is received by the Commission's Engineering Department."

From the wording of this order we interpret it to be the intention of the Commission to authorize the Whelans to inject water in irregularly located wells if the Manziels waived objection; but if the Manziels did not waive, then the Commission, as was done, would conduct a hearing to see whether, under the facts shown, the proposed exception should be granted.

■ The parties agree that the Commission has the power to grant exception to the order if the evidence establishes that it is necessary to drill a well at an irregular location in order to prevent waste or to prevent confiscation of property. If the right to the exception is supported by substantial evidence, the exact location of the well is in the Commission's sound discretion. See: Railroad Commission of Texas v. The Texas Company, Tex.Civ.App. (1957), 298 S.W.2d 666, wr. ref., n. r. e.; 58 C.J.S. Mines and Minerals § 137, p. 230. Thus, a principal issue presented for determination by this court is whether there is substantial evidence in the record which establishes that it is necessary for the injection well to be placed at an irregular location to prevent either the confiscation of the Whelans' property or waste in the field. However, before discussing this issue, we deem it appropriate to dispose of other issues raised on this appeal.

### Trespass

■ The Manziels pleaded that the injection of salt water by the Whelans in the Eldridge #11 well will cause damage to their producing wells, and will result in loss and injury to their oil and gas interests due to premature flooding. They assert, and we agree, that under our liberal rules of pleading, this wording is sufficient to give rise to the issue of trespass in considering the status of encroaching secondary recovery waters.

The subsurface invasion of adjoining mineral estates by injected salt water of a secondary recovery project is to be expected, and in the case at bar we are not confronted with the tort aspects of such practices. Neither is the question raised as to whether the Commission's authorization of such operations throws a protective cloak around the injecting operator who might otherwise be subjected to the risks of liability for actual damages to the adjoining property;[1] rather we are faced

---

1. For articles that are concerned with such problems see: Keeton and Jones: "Tort Liability and The Oil and Gas Industry II," 39 Tex.Law Rev. 253, Feb., 1961; Bowen: "Secondary Recovery Operations—Their Values and Their Legal Problems," Thirteenth Annual Institute on Oil and Gas Law and Taxation, (1960), at p. 331; Hughes: "Legal Problems of Waterflooding, Recycling and Other Secondary Operations." Ninth Annual Institute on Oil and Gas Law and Taxation, (1959), at p. 105; Smith: "Rights and Liabilities on Subsurface Op-

with an issue of whether a trespass is committed when secondary recovery waters from an authorized secondary recovery project cross lease lines.

In seeking to answer this question, we have examined cases covering almost every aspect of the oil and gas industry in this state where the plaintiff has gone into court against an operator on adjoining property who has caused some type of damage to or encroachment in the plaintiff's subsurface estate. In only one situation have we found an injunction granted on the applied theory of trespass.[2] With one exception,[3] all others have involved questions of liability for negligence[4] with which we are not here concerned.

■ To constitute trespass there must be some physical entry upon the land by some "thing," Gregg v. Delhi-Taylor Oil Corp., Tex., 344 S.W.2d 411 (1961); but is

injected water that crosses lease lines from an authorized secondary project the type of "thing" that may be said to render the adjoining operator guilty of trespass? It was stated in the Gregg case, where this question was anticipated but not decided:

"We are advised by an amicus curiae that the Commission has promulgated rules or orders which might authorize, or result in, the invasion of the subsurface of the land of others. Our attention is called to secondary recovery operations involving water or gas injection, waterflooding, the injection and storage of salt water, and the recycling of gas. We have heretofore indicated that no rules of the Commission are involved in these Delhi-Taylor cases. The *validity* and *reasonableness* of the rules and orders involved in those operations may be passed upon when and if they reach this court." (emphasis added)

erations," Eighth Annual Institute on Oil and Gas Law and Taxation, (1957), at p. 1; Jones: "Tort Liabilities in Secondary Recovery Operations," Sixth Annual Rocky Mountain Mineral Law Institute, (1961), at p. 639; Williams and Meyers: Oil and Gas Law, § 204.5 et seq. See also: Pray: "Oil and Gas: Subsurface Trespass," 15 Okla.Law Rev., (1962).

2. In instances where there is a continuing, physical invasion of an adjoining mineral estate by drilling across lease lines, the injecting operator commits a trespass and may be enjoined. Hastings Oil Co. v. Texas Co., (1950), 149 Tex. 416, 234 S.W.2d 389.

3. In Delhi-Taylor Oil Corp. v. Holmes, Tex., 344 S.W.2d 420, (1961), it was stated that a sand fracture was analogous to a pipe line leading to the well bore. The Holmes case is controlled by Gregg v. Delhi-Taylor Oil Corp., infra, wherein the question of trespass by authorized sandfracting on adjoining property was posed but not decided.

4. In cases involving:
(A) *Destructive Vibrations,* Universal Atlas Cement Co. v. Oswald, (1941), 138 Tex. 159, 157 S.W.2d 636; Indian Territory Illuminating Oil Co. v. Rainwater, Tex.Civ.App., (1940), 140 S.W.2d

491, writ dismissed; See: Smith: "Rights and Liabilities on Subsurface Operations," Eighth Annual Institute on Oil and Gas Law and Taxation 1, (1957);
(B) *Seismic Exploration,* Klostermann v. Houston Geophysical Co., Tex.Civ. App., (1958), 315 S.W.2d 664, wr. ref; Seismic Explorations v. Dobray, Tex.Civ. App., (1943), 169 S.W.2d 739, wr. ref. want merit; Dellinger v. Skelly Oil Co., Tex.Civ.App., (1951), 236 S.W.2d 675, wr. ref., n. r. e.; Stanolind Oil and Gas Co. v. Lambert, Tex.Civ.App., (1949), 222 S.W.2d 125, no writ hist.; See: Kennedy v. General Geophysical Co., Tex.Civ. App., (1948), 213 S.W.2d 707, wr. ref., n. r. e.; Trespass may not be committed by mere vibrations alone, 63 C.J.S. Municipal Corporations § 1186, p. 898;
(C) *Blowouts,* Elliff v. Texon Drilling Co., (1948), 146 Tex. 575, 210 S.W.2d 558, 4 A.L.R.2d 191; Keeton and Jones: "Tort Liability and the Oil and Gas Industry," 35 Tex.Law Rev. 1, (1956);
(D) *Shooting,* Liner v. United States Torpedo Co., Tex.Comm.App., (1929), 12 S.W.2d 552, affirmed, 16 S.W.2d 519; Comanche Duke Oil Co. v. Texas Pacific Coal and Oil Co., Tex.Comm.App., (1927), 298 S.W. 554; See: Jones: "Tort Liabilities in Secondary Recovery Operations," Sixth Annual Rocky Mountain Mineral Law Institute, 639, (1961).

A problem analogous to the situation that confronts this court is found in instances where gas is produced, the gasoline content removed therefrom, and the dry gas reinjected into the original reservoir from whence it was produced to preserve bottom-hole pressure; the process thus displacing the more valuable wet gas under adjoining leases with the dry reinjected gas. In Corzelius v. Harrell, 143 Tex. 509, 186 S.W.2d 961, (1945), a person so reinjecting complained that the Commission's order did not reasonably adjust correlative rights. Apparently both parties assumed that when the substances were reinjected, the rules which were applicable before the original capture again applied. See: Note 1, Oil and Gas Reporter, 1171; Williams and Meyers: Oil and Gas Law, § 204.5, footnote 1.

In considering the legal consequences of the injection of secondary recovery forces into the subsurface structures, one authority, Williams and Meyers, supra, has stated:

"What may be called a 'negative rule of capture' appears to be developing. Just as under the rule of capture a land owner may capture such oil or gas as will migrate from adjoining premises to a well bottomed on his own land, so also may he inject into a formation substances which may migrate through the structure to the land of others, even if it thus results in the displacement under such land of more valuable with less valuable substances (e. g., the displacement of wet gas by dry gas)."

Secondary recovery operations are carried on to increase the ultimate recovery of oil and gas, and it is established that pressure maintenance projects will result in more recovery than was obtained by primary methods. It cannot be disputed that such operations should be encouraged, for as the pressure behind the primary production dissipates, the greater is the public necessity for applying secondary recovery forces. It is obvious that secondary recovery programs could not and would not be conducted if any adjoining operator could stop the project on the ground of subsurface trespass. As is pointed out by amicus curiae, if the Manziels' theory of subsurface trespass be accepted, the injection of salt water in the East Texas field has caused subsurface trespasses of the greatest magnitude.[5]

■ The orthodox rules and principles applied by the courts as regards surface invasions of land may not be appropriately applied to subsurface invasions as arise out of the secondary recovery of natural resources. If the intrusions of salt water are to be regarded as trespassory in character, then under common notions of surface invasions, the justifying public policy considerations behind secondary recovery operations could not be reached in considering the validity and reasonableness of such operations. See: Keeton and Jones: "Tort Liability and the Oil and Gas Industry II," 39 Tex. Law Rev. 253 at p. 268. Certainly, it is relevant to consider and weigh the interests of society and the oil and gas industry as a whole against the interests of the individual operator who is damaged; and if the authorized activities in an adjoining secondary recovery unit are found to be based on some substantial, justifying occasion, then this court should sustain their validity.

■ We conclude that if, in the valid exercise of its authority to prevent waste, protect correlative rights, or in the exercise of other powers within its jurisdiction, the Commission authorizes secondary recovery projects, a trespass does not occur when the injected, secondary recovery forces move across lease lines, and the operations are not subject to an injunction on that basis. The technical rules of trespass have no

5. As of Jan. 1, 1958, 2,349,958,237 barrels of salt water have been injected into the Woodbine sand, the reservoir from which oil is produced. See: Salt Water Disposal, East Texas Oil Field, 2d ed.

place in the consideration of the validity of the orders of the Commission.[6]

## The Statutes

The Manziels further assert that the Commission, in authorizing the irregular spacing of the Eldridge #11 well, has violated the legislative command of Article 6029(4) [7] that wells shall be operated in such manner as to prevent injury to adjoining property. However, they would not make the same objection if the well in question was in a regular location. Under the statute, secondary recovery operations need not be field wide, but may be conducted in one or more but less than all

of the units of the reservoir. Such operations are primarily concerned with increasing the ultimate recovery of oil and gas and the prevention of waste. In any case in which secondary recovery procedures are used on one tract of a non-unitized field, it can be expected that eventually there will be a subsurface invasion of adjacent properties. If such operations are to have optimum success there is no way to prevent the eventual flooding of every well in the field. Unquestionably, the legislature was fully cognizant of this fact when it enacted Article 6008b, Vernon's Annotated Civil Statutes,[8] and regardless of what may be said to the contrary, the

---

6. For example an order of the Railroad Commission that authorized a subsurface invasion was upheld in Corzelius v. Railroad Commission, Tex.Civ.App., (1944), 182 S.W.2d 412, no writ hist., where necessary to prevent waste. There, Corzelius was ordered by the Railroad Commission to kill a well located on his lease that had developed a gas leak in the casing, had cratered, caught fire and was threatening the surrounding countryside. Corzelius could not afford to drill the necessary directional well, so the Commission authorized the adjoining leaseholder, Harrell, as the Commission's agent, to drill a directional well to be surfaced on Harrell's property and to be bottomed under Corzelius' land. Corzelius contended that such action constituted trespass. The court rejected this position with this statement:
"* * * the Commission in carrying out both the constitutional and statutory mandates, had the authority, in our opinion, * * * to authorize someone * * *, to enter upon his premises either above or below the surface * * * if necessary to stop * * * waste."
Further: "* * * being authorized by law such entry did not constitute a trespass."
However, it has been stated that the latter statement is not authority for the proposition that the type of deliberate action involved in sand fracting would not be a trespass, or as authorizing the Commission to license such action. Gregg v. Delhi-Taylor Oil Corp., supra.
See also: Humble Oil and Refining Co. v. L. & G. Oil Co., Tex.Civ.App., (1953), 259 S.W.2d 933, wr. ref., n. r. e.

7. Article 6029: "The Commission shall make and enforce rules, regulations or

orders for the conservation of crude petroleum oil and natural gas and to prevent the waste thereof, including rules, regulations or orders for the following purposes:
"* * * * (4) To require wells to be drilled and operated in such manner as to prevent injury to adjoining property."

8. Article 6008b, § 1: "Subject to approval of the Railroad Commission of Texas * * * persons owning or controlling production, leases, royalties, or other interests in separate properties in the same oil field, gas field, or oil and gas field, may voluntarily enter into and perform agreements for the following purposes:
"(A) To establish pooled units necessary to effect secondary recovery operations for oil or gas, including those known as cycling, recycling, repressuring, water flooding, and pressure maintenance and to establish and operate cooperative facilities necessary for said secondary operations;
"(B) * * *
"Such agreements shall not become lawful nor effective until the Commission finds, after application, notice and hearing:
"1. * * * that the rights of the owners of all the interests in the field, whether signers of the unit agreement or not, would be protected under its operation.
* * * * *
"All agreements executed hereunder shall be subject to any valid order, rule, or regulation of the Commission relating to location, spacing, proration, conservation, or other matters within the authority of the Commission * * *."

legislature has made it the policy of this state to encourage the secondary recovery of oil. It is a matter of common knowledge that secondary recovery methods sometimes result in more recovery than the total procured through primary production. Indeed, only 15% of the oil in place can be recovered by primary methods in the case at bar. It is thus concluded that Article 6029(4) has no application to authorized, secondary recovery projects, and that the provisions of Article 6008b control in such instances.

### Validity of Order

This being a case of first impression in this state, resort has been made to analogous cases from other jurisdictions. In the cases examined, the issue of trespass was not asserted, and regardless of the fact that there was migration across lease lines, the orders of the Conservation Commissions were upheld if they were supported by substantial evidence, and in the public interest and were necessary to protect correlative rights or to prevent waste in the field.

In Syverson et al. v. North Dakota State Industrial Commission, N.D.Sup.Ct. (1961), 111 N.W.2d 128, all the operators in the field decided to unitize in order to carry out a program of pressure maintenance, by the injection of water. A voluntary agreement was drafted and approved by the Commission, and Amerada Petroleum Corporation was designated as the unit operator. The operators succeeded in obtaining 98% of the mineral and royalty owners to agree thereto. Syverson refused to join on the grounds that he would not be paid enough if he were in the unit. The operators filed an application to authorize the beginning of injections and Syverson contested the granting of the application. The application was granted. The Commission pointed out that Syverson's interest was not within the area covered by the agreement, and that there was no showing that they would suffer actual damages.

The question presented on appeal was whether Amerada had the right to repressure the entire field by water injection into wells covered by the agreement. The court sustained the order of the Commission in finding that there was competent evidence to support the position of the Commission, that the program was in the public interest and was necessary to prevent waste and to protect correlative rights. In holding that regardless of the Syverson's non-joinder, the Commission had the power to order, and Amerada, the right to carry out, field-wide repressuring the court stated:

> "By refusing to join such agreement, however, appellants may not, at the same time prevent other interests in the field from developing adjoining tracts * * *. Whatever the result would be if the appellants could show actual damages, they are certainly not entitled to complain in the absence of such a showing."

Reed v. Texas Co., (1959), 22 Ill.App.2d 131, 159 N.E.2d 641, is more closely in point. There, three owners of a portion of the reservoir who had not entered into the pressure maintenance project sought an injunction against the Texas Company to require the discontinuance of a field-wide waterflooding program. Reed contended that the operation was forcing oil, to which they had "title," from under their property. The program involved the placing of injection wells around the periphery and others in the interior area of the pool. The latter were spotted as close to boundaries of leaseholds as was practical, so as to diffuse the pressure and minimize the migration of oil from one leasehold to another. The Chancellor heard testimony concerning the physical condition of the pool and the production history of each well in the field. The prayer for injunction was denied and an appeal followed.

In holding that the denial of the injunction should be sustained the court commented:

> "If a minority of one or more persons affected by the operations could prevent it by refusing to join in the agreement, they could then force the others to choose between leaving a

large part of the oil underground, or consent to granting the dissidents an unreasonably large percentage of the oil. In other words, *the power to block a repressure program by refusing to sign the unitization agreement, would be the power to insist upon unjust enrichment. Surely a court of equity should not support such a rule.* (Emphasis added.)

"As to whether the plan in this case was reasonable and fair to all parties, there was a dispute, but the Chancellor heard the testimony, therefore, *this court looks only to the question of whether there is substantial evidence to support the result.*" (Emphasis added.)

In Jackson v. State Corporation Commission, (1960), 186 Kan. 6, 348 P.2d 613, Tidewater applied to the Kansas Corporation Commission, in 1953, for authority to waterflood a sand formation under eleven sections of land. The application was approved and the pressure maintenance project was begun. After that date, the Jackson Brothers obtained paying primary production by completing 12 oil wells on its lease. Tidewater's pressure maintenance project and secondary recovery operations had advanced to land adjoining the Jackson Brothers' lease. Tidewater proposed that the Jackson Brothers join the project, but the Jacksons declined because of their recent beginning of primary recovery. They objected to the continuance of the program, and asked for an immediate order to cease and desist, and a permanent modification of Tidewater's repressuring authority because Tidewater's operations were allegedly damaging the Jackson Brothers and causing waste of oil.

In July, 1956, Tidewater had drilled three injection wells in a line north and south about twelve feet from the Jackson Brothers' boundary and flooded two of their wells within a matter of hours. The Commission issued a temporary cease and desist order and the injection wells were shut down.

One of the issues presented before the Commission was whether Tidewater's flooding operations were lawful. The Commission decided, and the Supreme Court quoted with approval, that:

"There was no claim or evidence of Tidewater exceeding its authority by its normal pattern of line injection wells used to confine the oil in the lease for production from a central well. One injection well eventually floods every producing well in the reservoir and the legislature was aware of this effect of repressuring when the authorizing statute was passed."

"Producing wells may be flooded out in repressuring activities but the oil is not lost; it is only pushed forward by the injected water and is still confined, awaiting capture. The Commission's rule * * * as to correlative rights provides that no one producer can be enriched to the detriment of other producers in a common source of supply by taking an undue proportion of the oil or gas obtainable therefrom, or by causing undue drainage between developed leases. *The only way to prevent movement of oil from one lease to another and protect correlative rights is to place input wells along the boundary between.*" (Emphasis added.)

The Commission concluded that no waste of natural resources or injury to correlative rights was shown. It dismissed the Jackson Brothers' complaint, and rescinded the temporary cease and desist order. The Jackson Brothers appealed. The principal matter before the trial court was whether there was substantial evidence to support those findings and decision. The trial court agreed with all the Commission's findings and with its decision; and the Supreme Court of Kansas affirmed the judgment of the trial court, thereby approving the order of the Commission.

These authorities, in principle, support our view that it was the purpose of the

Legislature in adopting our conservation laws that in any oil or gas field the Commission should have power, even the duty, to prevent undue drainage of oil across lease lines. The Commission has two primary duties in the administration and control of our oil and gas industry. It must look to each field as a whole to determine what is necessary to prevent waste while at the same time countering this consideration with a view toward allowing each operator to recover his fair share of the oil in place beneath his land. In carrying out these duties, there has devolved upon the Commission the power to promulgate rules, orders and regulations that control the industry, and such are issued pursuant to the police power of the state, and that power may invade the right of the owner of the land to the oil in place under his land as long as it is based on some justifying occasion, and is not exercised in an unreasonable or arbitrary manner. See: Brown v. Humble Oil and Refining Co., 126 Tex. 269, 83 S.W.2d 935, 87 S.W.2d 1069, 99 A.L.R. 1107, 101 A.L.R. 1393, (1935).

The rules of ownership are of prime importance, but in this consideration the rights of one do not exceed the rights of another. As to oil and gas, the surface proprietors within the field have the co-equal right to take from the common source of supply. It follows from the nature of oil and gas that the use by one of his power to seek to convert a part of the common reservoir to actual possession may result in an undue portion being attributed to one of the possessors of the right to the detriment of the other. Hence, it is within the Commission's power to protect the vested rights of all the collective owners, by securing a just distribution, and to reach the like end by preventing waste.

There is no dispute as to the necessity of injecting larger amounts of water into the reservoir to prevent waste in the field, and from the evidence it appears that regardless of whether the Eldridge #11 well is located at a regular or irregular spacing there will be no appreciable difference in the amount of oil recoverable from the reservoir as a whole. The only dispute is as to where the necessary injection well should be located to serve the dual purpose of facilitating efficient recovery of oil and the protection of the correlative rights of the Whelans. If we are to sustain the validity of the order involved here, it must be on the ground that there is substantial evidence that the exception is necessary to protect correlative rights and prevent undue drainage.

The evidence shows that the Manziel-Mathis lease comprises 40.36 acres with an estimated 184 productive acre feet underlying. It is further estimated that approximately 816 to 824 barrels of oil per acre foot were originally in place in the field. The Whelan Brothers' expert testified that an estimated 118,296 barrels of oil was the total amount of oil in place under the Mathis tract. It is estimated that only between 17,744 barrels to 22,700 barrels of this total amount was recoverable by primary means. However, the production figures show that as of Sept. 1, 1961, the Mathis well has actually produced 45,720 barrels[9] of oil.

The Manziels assert that as to the total field production, the Manziels' interest has recovered 64.8% thereof while the Whelan Brothers have recovered only 35.2%; but that with the existing injecting wells recovery from all the Manziels' interest will be reduced to 57% of the total while the Whelans' will increase their total recovery to 43% from Sept. 1 to abandonment. The Manziels further contend, that if injection is allowed to continue in the Eldridge #11 well, the Whelans will have the advantage of 51.1% of the total recovery from 1961 to abandonment, while the Manziels are relegated to recovering only 48.9%. The position of the parties is clarified by showing

---

9. Thus, while owning only an estimated 1.8 to 2.4% of the total productive feet in the field, the Manziel-Mathis well has had 5.8% of the field's total primary recovery.

that of the total productive acre feet, the Manziels control between 53½ to 59% while the Whelans hold from 41 to 46½%. In chart form:

| | % of total productive acre feet | % of primary production 1956–1961 | % of secondary recovery with existing injection wells. 1961 to abandonment | % of secondary recovery including Eldridge #11 as injection well. 1961 to abandonment |
|---|---|---|---|---|
| Manziels | 53½ to 59% | 64.8% | 57% | 48.9% |
| Whelans | 41 to 46½% | 35.2% | 43% | 51.1% |

It is established that the effect of the existing pattern of flooding is to cause the remaining oil in the field to be pushed toward the Mathis lease, and due to the high rate of production from the Mathis well, the process is being aided by a great disparity in pressures.[10] According to the testimony of the Whelans' expert, a large amount of the estimated 118,296 bbls. of oil originally in place under the Mathis lease lies to the north of the Mathis well and will not be produced from under that lease due to pressure differentials. It appears that the pressure is greater in the south, east and west than in the north and northwest. It stands to reason that under these conditions, the drainage from the Whelan Brothers-Vickie Lynn Unit will continue.

The Manziels' expert witness testified that without the Whelans' Eldridge #11 well being used for injection purposes, that the primary life of the Mathis well would be from 3 to 5 years with only a "small" benefit from past water injections, and that from Sept. 1, 1961, to the end of production from the Mathis well, an additional 61,000 bbls. of oil will be recovered. However, it appears that without instituting repressure operations of their own on the Mathis lease, the Manziels *will* reap the benefit of the repressure operations of ad-joining tracts and recover approximately 106,720 bbls.[11] of oil while there was only, at the most, 22,700 bbls. of oil originally in place recoverable by primary methods. Thus, while the remainder of the field is only able to recover approximately 15% of the total amount of oil in place beneath their tracts without resorting to secondary operations; the Manziels may recover an amount equal to 90%[12] of the total recoverable reserves in place under the Mathis lease without resorting to such operations. In other words, unless the Eldridge #11 well is used for injection purposes, the Mathis well will recover over 5 times the amount of oil it would have been able to recover if primary production had been adjusted according to the proportion of productive acre feet beneath the Mathis lease. Admittedly, this disparity would be caused by drainage from other leases.

From these figures it is established that without resorting to secondary operations on its Hollandsworth leases, and continuing to rely on primary methods of production, the Manziel Estate-Mathis lease has, and will continue to, produce far in excess of its fair share of the oil in place originally recoverable through the use of such methods. It further appears that unless the order granting the exception is held to

10. It is shown that the pressure at the Mathis well is only 87 pounds per square inch, while the pressure at the Eldridge #11 well is 551 pounds per square inch; the remaining wells in the field report pressures varying from 254 to 328 pounds per square inch.

11. 45,720 bbls. recovered as of Sept. 1, 1961, plus 61,000 bbls. of estimated future recovery from the Mathis well if the Eldridge #11 well is not used at all.

12. Estimated total recovery with the Eldridge #11 well not used at all of 106,-720 bbls. of oil divided by 118,296, the total bbls. of oil originally in place under the Mathis lease.

be valid, the production will even further exceed the fair share of the primary recovery. Clearly, the Mathis lease has produced, will produce, and will retain thereunder an amount of oil that is its fair share of both the primary and secondary stages of recovery.

We are of the opinion that the order of the Railroad Commission of Texas should be upheld on the ground that there is substantial evidence that the exception here in question is necessary to protect the correlative rights of the Whelan Brothers-Vickie Lynn Unit and to prevent drainage from such unit across lease lines to the Manziel Estate's Hollandsworth leases, and particularly the Mathis lease. Therefore, the judgment of the trial court is reversed and judgment is here rendered that the permanent injunctions granted by the trial court against the Railroad Commission of Texas and the Whelans be dissolved, and that the Manziels take nothing.