FRANKLIN W. BAUMGARTNER, APPELLEE AND CROSS-APPELLANT, V. GULF OIL CORPORATION, APPELLANT AND CROSS-APPELLEE, STATE OF NEBRASKA, INTERVENER-APPELLEE AND CROSS-APPELLANT.

168 N. W. 2d 510

Filed May 9, 1969.   No. 37092.

Martin, Davis, Mattoon & Matzke and James B. Diggs, for appellant.

Clinton & McNish and Raymond J. Gengler, for appellee.

Clarence A. H. Meyer, Attorney General, and Bernard L. Packett, for intervener-appellee.

Heard before WHITE, C. J., CARTER, SPENCER, SMITH, McCOWN, and NEWTON, JJ., and RONIN, District Judge.

SPENCER, J.

This is an action at law for willful trespass and conversion. Plaintiff sued for the value of oil claimed to have been displaced and swept from land under lease to him by defendant into its waterflood unit recovery wells.

Plaintiff was the holder of an oil and gas lease granted by the State of Nebraska, the owner of the minerals underlying Section 16, Township 18 North, Range 53 West of the 6th P.M., Banner County, Nebraska. Plaintiff acquired the lease June 13, 1960, and allowed it to lapse June 13, 1965.

Defendant is the owner of the Kenmac "J" Sand Unit, Banner County, Nebraska, hereinafter referred to as Kenmac, which was formed to increase the ultimate recovery of oil and to prevent waste. In consequence of the depletion of the field the lessees thereon had, before plaintiff obtained his lease, commenced studies as to the feasibility of unitizing the field. This involved the merger of all of the interests in the oil pool and the designation of an operator for the unit. Defendant was so designated for Kenmac. Except for Kenmac there would have been no recovery of secondary oil. The Nebraska Oil and Gas Conservation Commission, hereinafter called the commission, entered an order April 24, 1961, approving the unit agreement, which provided for the secondary recovery of the oil by waterflooding. It was signed by all of the working-interest owners in the field except the plaintiff, and by the owners of more than 80 percent of the royalty interests, including the plaintiff's lessor, the Nebraska Board of Educational Lands and Funds. When the plaintiff refused to join the unit, Section 16 was excluded from it and plaintiff's lessor withdrew its consent.

Kenmac offsets plaintiff's lease on the east and the north. Exhibit 2, which is reproduced herewith, shows. the boundaries of Kenmac as well as the outline of the. oil-bearing stratum involved herein:

Waterflooding is the controlled introduction of water into an oil-producing stratum or oil reservoir for the

purpose of recovering oil which cannot be produced by normal primary methods. Water is injected into selected wells to create pressure to force the oil toward producing wells. In this instance water was injected on the north into wells 1 and 2, and on the south into wells 3 and 4. These wells forced the oil toward wells 10, 11, and 12, the final point of recovery. In November 1964, it was necessary to convert well 7 to an injection well. The introduction of water into an oil reservoir causes oil and water to migrate across lease lines and it is impossible to restrict the advance of the water to lease lines. Because of this encroachment it is necessary to unitize a field to protect the correlative rights of all those holding interests in the field.

A prior lessee of Section 16 had drilled a dry hole in the northeast quarter of the section. This dry hole and other wells on the adjoining sections had established that the oil-bearing sands under plaintiff's lease were in the northeast quarter of the northeast quarter of the northeast quarter, hereinafter referred to as NENENE, with a thin and narrow strip along the east edge of the section.

Plaintiff's engineer testified that prior to the formation of the unit, oil had been drained from Section 16 by the off-setting wells to the north and the east. The 23 producing wells shown on the plat had so depleted the field that the nearest well offsetting plaintiff's lease had been temporarily abandoned because of insufficient production. The parties stipulated that as of June 6, 1961, there were only 2,254.2 barrels of recoverable primary oil, worth $6,063, under the plaintiff's lease. The amount of oil underlying Section 16 for recovery by secondary methods was stipulated to be 36,624.1 barrels, while the recovery from the entire reservoir was 1,658,955 barrels. It is undisputed that the cost of drilling a well to recover the primary oil on Section 16 was far in excess of $6,063.

Plaintiff's engineer also testified that in the absence of Kenmac there would not have been any secondary

oil recovered on Section 16. Plaintiff refused to join the unit, and after it was approved he applied for a permit to drill a well in the NENENE. This permit was refused by the commission because plaintiff was able to include his section in Kenmac, but its order was subsequently reversed by the district court. No well was drilled because the recoverable oil by this time had been swept from the section. Plaintiff's engineer conceded that if plaintiff had been permitted to drill a well on the NENENE it would have resulted in the drainage of oil from Kenmac. The testimony clearly would indicate that plaintiff could not have profitably developed his lease. In the absence of Kenmac no secondary oil could have been recovered from Section 16 so the independent development of Section 16 would have resulted in an economic loss except for the waterflooding by Kenmac.

Plaintiff's manager of operations, who was his principal witness, actually had been instrumental in setting up the unit agreement and the operator's agreement for Kenmac. This was before he entered plaintiff's employment in June 1962. He admitted that Kenmac was properly formed; that a common-assessment formula was used for all undeveloped acreages; and that the assessment formula and the amount allocated to plaintiff's tract were fair and equitable. Plaintiff refused to join the unit unless this assessment was waived as to his section. This the other parties to the agreement would not do, and plaintiff's section was excluded from the unit.

If the plaintiff had joined Kenmac and borne his share of the development and operating costs, his profit would have been $27,455, and the State of Nebraska would have received $7,377 for royalties. The evidence would indicate that if plaintiff had drilled his own well, the highest estimate of his profit would be $12,224.

The trial court applied the common law doctrine of willful trespass, and entered judgment against the defendant in the amount of $89,933 for the value of the

oil drained from Section 16, without the deduction of any development or operating costs necessary to produce that oil. Defendant perfected an appeal to this court.

This is a case of first impression in this state. However, in view of the objectives of the Nebraska Oil and Gas Conservation Act, hereinafter referred to as act, and the apparent public policy inherent therein, as well as the nature of oil and gas, we cannot accept the premise on which judgment was rendered by the trial court.

Section 57-901, R. R. S. 1943, provides as follows: "It is hereby declared to be in the public interest to foster, to encourage and to promote the development, production and utilization of natural resources of oil and gas in the state in such a manner as will prevent waste; to authorize and to provide for the operation and development of oil and gas properties in such a manner that the greatest ultimate recovery of oil and gas be had; and that the correlative rights of all owners be fully protected; and to encourage and to authorize cycling, recycling, pressure maintenance and secondary recovery operations in order that the greatest possible economic recovery of oil and gas be obtained within the state to the end that the landowners, the royalty owners, the producers and the general public realize and enjoy the greatest possible good from these vital irreplaceable natural resources.

"It is the intent and purpose of sections 57-901 to 57-921 to permit each and every oil and gas pool in Nebraska to be produced up to its maximum efficient rate of production, subject to the prohibition of waste as herein defined and subject further to the enforcement and protection of the correlative rights of the owners of a common source of oil or gas so that each common owner may obtain his just and equitable share of production therefrom."

Since the formation of Kenmac, our law has been amended to provide for compulsory unitization upon the approval of 75 percent of the production owners and

those required to pay 75 percent of the development costs. § 57-910.03, R. R. S. 1943. This case, however, must be decided under the law as it existed before the compulsory unitization amendment.

To appreciate the importance of the legislative policy, one needs only to understand the importance of secondary oil recovery in Nebraska. We quote herewith from reports made by the director of the commission to the Interstate Oil Compact Commission: " 'As in previous years, the recovery of secondary oil formed a prominent part of Nebraska's producing picture. To January 1, 1966, Nebraska reservoirs had contributed over 36 million barrels of secondary oil. This volume was recovered as a direct result of the application of secondary energy for production. The quantity represents 15 percent of all oil produced in the state since the original oil discovery in 1939.' (The Interstate Oil Compact Bulletin, June 1966) * * *

" 'At this time, 76 secondary recovery or pressure maintenance projects are underway in Nebraska—72 involve water injection, two involve miscible slugs while one project consists of gas recycling and one involves both gas recycling and water injection. Approximately 40 percent of Nebraska's current oil production comes as a direct result of the introduction of extraneous fluids into the State's reservoirs.' (The Interstate Oil Compact Bulletin, December, 1966)"

As plaintiff suggests, in Krone v. Lacy, 168 Neb. 792, 97 N. W. 2d 528, we quoted with approval the following from Broderick v. Stevenson Consolidated Oil Co., 88 Mont. 34, 290 P. 244: " 'Oil remaining in the ground before recovery is a part of the land, and belongs to the owner of the land; * * *.' " This statement, however, is subject to the qualification well expressed in Ohio Oil Co. v. Indiana, 177 U. S. 190, 20 S. Ct. 576, 44 L. Ed. 729: "No time need be spent in restating the general common law rule that the ownership in fee of the surface of the earth carries with it the right to the minerals

beneath, and the consequent privilege of mining to extract them. * * * The question * * * is this: Does the peculiar character of the substances, oil and gas, which are here involved, the manner in which they are held in their natural reservoirs, the method by which and the time when they may be reduced to actual possession or become the property of a particular person, cause them to be exceptions to the general principles applicable to other mineral deposits, and hence subject them to different rules? True it is that oil and gas, like other minerals, are situated beneath the surface of the earth, but except for this one point of similarity, in many other respects they greatly differ. They have no fixed situs under a particular portion of the earth's surface within the area where they obtain. They have the power, as it were, of self-transmission. No one owner of the surface of the earth, within the area beneath which the gas and oil move, can exercise his right to extract from the common reservoir, in which the supply is held, without, to an extent, diminishing the source of supply as to which all other owners of the surface must exercise their rights. The waste by one owner, caused by a reckless enjoyment of his right of striking the reservoir, at once, therefore, operates upon the other surface owners. Besides, whilst oil and gas are different in character, they are yet one, because they are unitedly held in the place of deposit. In Brown v. Spilman, 155 U. S. 665, 669, 670, these distinctive features of deposits of gas and oil were remarked upon. The court said:

" 'Petroleum gas and oil are substances of a peculiar character, and decisions in ordinary cases of mining, for coal and other minerals which have a fixed situs, cannot be applied to contracts concerning them without some qualifications. They belong to the owner of the land, and are a part of it, so long as they are on it or in it, or subject to his control, but when they escape and go into other land, or come under another's control, the title of the former owner is gone. If an adjoining owner

drills his own land and taps a deposit of oil or gas, extending under his neighbor's field, so that it comes into his well, it becomes his property.' "

There is no claim for the oil which naturally migrated from Section 16 by reason of the offsetting wells to the north and east, because this is governed by the law of capture. Under the law of capture, an owner of land acquires title to oil or gas which he produces from wells on his land although part of the oil or gas may have migrated from adjoining wells. He may thus appropriate the oil and gas that have flowed from adjacent lands without the consent of the owner of those lands and without incurring liability to him for drainage. California Company v. Britt, 247 Miss. 718, 154 So. 2d 144.

The rule of capture is applied to oil which migrates without the introduction of extraneous substances into the oil-producing stratum to induce migration. Here an extraneous substance, water, was injected into wells on adjoining sections which induced migration. It is this inducement which plaintiff alleges constitutes a willful trespass as to his property.

We cannot ignore the fact that the operation of Kenmac was specifically authorized and approved by commission, effective April 18, 1961, and that the project was at all times conducted in conformity with the order of the commission. Plaintiff concedes this fact, but maintains that the order of commission was applicable to only the lands in the unit, and that Section 16 was not a part of it. Although Section 16 was excluded from the project, everyone involved, including the plaintiff, would understand that there was no way to seal off the oil under Section 16 from the pool, and that from its very nature water injected into wells 1 and 2 would eventually reach the narrow portion of the reservoir in Section 16 and sweep oil from it. It is this very fact which required that plaintiff be afforded an opportunity to join the project. Plaintiff was offered this opportunity on a fair and equitable basis. As an oil operator, he was fully

cognizant of the fact that unless the other operators in the field were willing to abandon the project and thus waste more than a million and a half barrels of recoverable oil, they would either be forced to meet his demand for an unreasonable return at their expense, or go ahead with the project without him and incur possible liability for sweeping oil from under his leased land in the process. They did the latter. Did they incur liability for willful trespass? We hold they did not. Plaintiff contends no issue of waste is presented in this case. We do not agree. Defendant's every action was premised on the prevention of waste.

We have reached the conclusion that where the primary recoverable oil has been exhausted, all interested parties in the field must be offered an opportunity to join in any unitization project to recover secondary oil on a fair and equitable basis, and if any interested party refuses to join he should not be permitted to capitalize on that refusal. To hold otherwise would discourage unitization and encourage rather than avoid waste. Consequently, we hold where a secondary recovery project has been authorized by the commission the operator is not liable for willful trespass to owners who refused to join the project when the injected recovery substance moves across lease lines.

While the fact situation is not analogous, some of the language in Railroad Commision of Texas v. Manziel (Tex.), 361 S. W. 2d 560, 93 A. L. R. 2d 432, is pertinent herein. That case was a waterflooding operation on a lease rather than a unit basis. The regular location for a lease input well was 660 feet from the property line, but the commission authorized the appellant to place an input well 206 feet from the Manziels' property line. The evidence indicated Manziels were producing far in excess of the original oil in place on their land and, without the specific limitations of the water input well, would continue to obtain more than their fair share. The following language is of interest herein: "To con-

stitute trespass there must be some physical entry upon the land by some 'thing,' Gregg v. Delhi-Taylor Oil Corp., Tex., 344 S. W. 2d 441 (1961); but is injected water that crosses lease lines from an authorized secondary project the type of 'thing' that may be said to render the adjoining operator guilty of trespass? * * *

"A problem analogous to the situation that confronts this court is found in instances where gas is produced, the gasoline content removed therefrom, and the dry gas reinjected into the original reservoir from whence it was produced to preserve bottomhole pressure; the process thus displacing the more valuable wet gas under adjoining leases with the dry reinjected gas. In Corzelius v. Harrell, 143 Tex. 509, 186 S. W. 2d 961, (1945), a person so reinjecting complained that the Commission's order did not reasonably adjust correlative rights. Apparently both parties assumed that when the substances were reinjected, the rules which were applicable before the original capture again applied. See: Note 1, Oil and Gas Reporter, 1171; Williams and Meyers: Oil and Gas Law, § 204.5, footnote 1.

"In considering the legal consequences of the injection of secondary recovery forces into the subsurface structures, one authority, Williams and Meyers, supra, has stated:

" 'What may be called a "negative rule of capture" appears to be developing. Just as under the rule of capture a land owner may capture such oil or gas as will migrate from adjoining premises to a well bottomed on his own land, so also may he inject into a formation substances which may migrate through the structure to the land of others, even if it thus results in the displacement under such land of more valuable with less valuable substances (e.g., the displacement of wet gas by dry gas).'

"Secondary recovery operations are carried on to increase the ultimate recovery of oil and gas, and it is established that pressure maintenance projects will re-

sult in more recovery than was obtained by primary methods. It cannot be disputed that such operations should be encouraged, for as the pressure behind the primary production dissipates, the greater is the public necessity for applying secondary recovery forces. It is obvious that secondary recovery programs could not and would not be conducted if any adjoining operator could stop the project on the ground of subsurface trespass. * * *

"The orthodox rules and principles applied by the courts as regards surface invasions of land may not be appropriately applied to subsurface invasions as arise out of the secondary recovery of natural resources. If the intrusions of salt water are to be regarded as trespassory in character, then under common notions of surface invasions, the justifying public policy considerations behind secondary recovery operations could not be reached in considering the validity and reasonableness of such operations. See: Keeton and Jones: 'Tort Liability and the Oil and Gas Industry II,' 39 Tex. Law Rev. 253 at p. 268. Certainly, it is relevant to consider and weigh the interests of society and the oil and gas industry as a whole against the interests of the individual operator who is damaged; and if the authorized activities in an adjoining secondary recovery unit are found to be based on some substantial, justifying occasion, then this court should sustain their validity.

"We conclude that if, in the valid exercise of its authority to prevent waste, protect correlative rights, or in the exercise of other powers within its jurisdiction, the Commission authorizes secondary recovery projects, a trespass does not occur when the injected, secondary recovery forces move across lease lines, and the operations are not subject to an injunction on that basis. The technical rules of trespass have no place in the consideration of the validity of the orders of the Commission."

Plaintiff, who seeks to distinguish Railroad Commission of Texas v. Manziel, *supra,* from the instant case,

calls attention specifically to the following language: "The Commission has two primary duties in the administration and the control of our oil and gas industry. It must look to each field as a whole to determine what is necessary to prevent waste while at the same time countering this consideration with a view towards allowing each operator to recover his fair share of the oil in place beneath his land."

California Company v. Britt, 247 Miss. 718, 154 So. 2d 144, involved a claim of willful trespass for drainage by owners of an unsigned fractional mineral interest against the operator of a voluntary unitization of an oil field, using a pressure maintenance program where their interest had been excluded upon their refusal to join the unit. The Mississippi Supreme Court held that the injection of gas into a unit well which swept oil from plaintiff's land onto the unit where it was produced by a unit recovery well, did not constitute a common law trespass. The following from that case is pertinent herein: "The theory of complainants' bill was a willful and malicious trespass by the defendant. Yet they failed to show that California committed any actionable wrong or breach of duty toward them. Is drilled no well on the 20 acres in which appellees owned an unleased one-fourth mineral interest.

"Sun had no lease from them after 1954. Prior to that time, California offered appellees participation in the unit. The Brookhaven Unit was validly created, and was approved by the State Oil and Gas Board. Unit wells have been drilled in accordance with permits from the board. The board found that the unitization agreements would conserve natural resources, prevent waste, and result in a larger ultimate recovery from the field. * * *

"Since there was no invasion of appellees' mineral interest by drilling a well on it, and all of California's activities have been in accord with the requirements of the conservation act and orders of the board, this is

one of those cases, somewhat unusual today, where the law of capture applies: The owner of land 'acquires title to the oil or gas which he produces from wells on his land, though part of the oil or gas may have migrated from adjoining lands. He may thus appropriate the oil and gas that have flowed from adjacent lands without the consent of the owner of those lands, and without incurring liability to him for drainage.' * * *

"Owners of royalty or unleased mineral interests are entitled to come into a unitization program under fair, reasonable, and equal terms with other participants in the unit, similarly situated. The ideal is that each operator's share of production from the unit should be in exact proportion to the contribution which he makes to the unit. * * * The basis of participation in production is a complex factor. Essentially, the unsigned or 'window' interest would have to join in the unitization on the basis of equal, proportionate participation with others who are parties to the agreement, * * *."

Plaintiff predicates much of his case on Tidewater Oil Co. v. Jackson, 320 F. 2d 157. As we view that case, it is readily distinguishable from the instant one. There the court, applying Kansas law, affirmed a substantial judgment for damages when water injected by Tidewater broke through a semipermeable barrier between the leased property of the two parties and damaged Jackson's wells, which were still producing primary oil. Here there were no producing wells on Section 16, and the evidence is conclusive it was not economically feasible to drill one in the absence of Kenmac.

Plaintiff throughout his brife asserts that he was precluded from drilling his unorthodox well by the objections of the defendant, and that this action indicates the willfulness of defendant's trespass. There is no merit to this suggestion. Without passing on plaintiff's right to drill a well, we find the evidence is conclusive that it could not have been profitable except for Kenmac, and even plaintiff's witness admits it would have re-

sulted in plaintiff recovering secondary oil from Kenmac. Suffice it to say that we consider it to be a basic and fundamental principle of all conservation legislation that the correlative and constitutional right of a landowner or leaseholder is not the right to drill but the right to recover his just and equitable share of the oil and gas underlying his property. "Correlative rights" are defined in section 57-903, R. R. S. 1943, of our Oil and Gas Conservation Act, as follows: "Correlative rights shall mean the opportunity afforded to the owner of each property in a pool to produce, so far as it is reasonably practical to do so without waste, his just and equitable share of the oil or gas, or both in the pool; * * *."

Plaintiff was given every opportunity to secure his just and equitable share of the oil in the pool by being offered fair, reasonable, and equal participation with the other interested parties in Kenmac. He refused to participate as he had every right to do. As an oil operator we must assume that he was fully aware of the consequences of his refusal. While we agree he had a perfect right to refuse to join the project, he should not be rewarded because he did. Neither should he be permitted to recover what he would have received if he had assumed the risks of that project. To hold either way would serve to defeat the purpose of our conservation act and would promote waste by effectively discouraging the formation of secondary recovery units which are so essential to the oil industry in this state.

The statute provides and plaintiff insists his correlative rights in the oil underlying his lease must be protected. That oil, however, was oil which could not be profitably produced by primary methods. The evidence is also conclusive that plaintiff could not have recovered secondary oil except for Kenmac. Under the facts herein the most that plaintiff should have a right to recover is what he can prove by a preponderance of the evidence he could have obtained through his own efforts if he

had drilled, developed, and operated his property outside the unitization project; that is, if no unitization had occurred. There is evidence that any operation by plaintiff would have resulted in an economic loss. If the testimony of his manager of operations is accepted, then the profit he could have realized from his own operations for both primary and secondary recovery would have been $12,224. This would be the limit of plaintiff's just and equitable share for oil displaced from Section 16 by Kenmac in the absence of other evidence.

The State of Nebraska originally signed the Kenmac agreement but was forced to withdraw its assent when plaintiff refused to sign. The State has made no attempt to prove the extent of lost royalty payments but has accepted in its entirety the plaintiff's presentation. Any recovery by the State must be determined under the rules enunciated above.

For the reasons enumerated, the judgment herein is reversed and the cause remanded to the district court for retrial under the rule of damages enunciated above. Costs are taxed to the plaintiff-appellee.

REVERSED AND REMANDED.

NEWTON, J., dissenting.

Notwithstanding that I heartily concur in the facts and the propositions of law set forth in the majority opinion, I find that I must respectfully dissent from the result reached. The majority opinion relies basically upon two propositions of law. The first is the law of capture which basically provides that one who drills an oil well upon his own land may, without liability, pump the oil out from under his neighbor's land. The second is the rule pertaining to correlative rights which means that each owner of property lying over a pool of oil shall be afforded an opportunity to obtain his just share of the oil.

The opinion is based upon the following facts. Plaintiff could not have profitably developed his lease. The amount of primary oil he could have recovered would not have paid for the expense of drilling. No secondary

oil whatsoever could have been recovered without the efforts of the other owners who joined together in the organization referred to as Kenmac and instituted measures for the recovery of the secondary oil, each contributing his or its respective share toward the expense of such secondary recovery and each taking a proportionate risk of a profitable result. Plaintiff, in accordance with the rule of correlative rights, was afforded an opportunity to join in Kenmac, contribute to the expense, and share in the profit to be derived from the recovery of secondary oil. He refused to do so. Had he joined, the venture would have been a profitable one for him and for his lessor, the State of Nebraska.

The picture presented is one in which it is apparent that plaintiff would have lost money had he drilled a well and sought to recover primary oil. If he had drilled the well when Kenmac instituted its secondary recovery process, plaintiff might have been able to recover from his own well sufficient secondary oil to have shown a profit, but this profit could only have been realized through the efforts of the other owners who joined in Kenmac. The majority opinion states: "We have reached the conclusion that where the primary recoverable oil has been exhausted, all interested parties in the field must be offered an opportunity to join in any unitization project to recover secondary oil on a fair and equitable basis, and if any interested party refuses to join he should not be permitted to capitalize on that refusal. To hold otherwise would discourage unitization and encourage rather than avoid waste." I concur in this statement of principle, but if this principle is to be applied, then plaintiff has no basis for recovery whatsoever and neither does plaintiff's lessor. Quite conclusively, plaintiff would have lost money had he made an attempt to recover his share of the primary oil and he could not have shown a profit without the efforts of Kenmac in producing secondary oil, a project in which he refused to join. If, therefore, he is permitted to recover, he is

then being permitted to capitalize on his refusal to cooperate and to join in Kenmac.

In my opinion, the judgment should be reversed and the cause dismissed.