CORLEY, et al. *v.* MISSISSIPPI STATE OIL AND GAS BOARD

No. 40937 October 13, 1958 105 So. 2d 633

*Satterfield, Shell, Williams & Buford, K. Hayes Callicutt,* Jackson, for appellants.

*Wells, Thomas & Wells, Brunini, Everett, Grantham & Quin, Heidelberg, Woodliff, Castle & Franks, Charles C. Richmond, Taylor Carlisle, James A. Boone, Earl T. Thomas, John M. Grower, Cecil F. Heidelberg,* Jackson; *Tom P. Caldwell,* Hattiesburg; *E. L. Brunini,* Vicksburg, for appellees.

204

ETHRIDGE, J.

We are concerned here with the validity of special field rules of the State Oil and Gas Board with reference to (a) the size of spacing units in a field, where practically all of the royalty and operating owners have signed a voluntary unitization of their interests in an oil pool, and (b) an allowable formula.

Eight appellants protesting promulgation of certain rules proposed by appellee Gulf Oil Corporation were respondents before the Board. Appellants also proposed certain rules. After a lengthy hearing the Board adopted on April 17, 1957, amendments to Special Field Rules for the Soso Field. With reference to spacing, they were substantially those proposed by Gulf, but the Board did not adopt the allocation formula proposed by either side. Protestants appealed to the circuit court; Gulf took no cross-appeal. That court affirmed the Board's order.

The issues are (1) whether the 1957 amendments to the special field rules are within the statutory powers of the Board; and (2) whether they are supported by substantial evidence. Both of these inquiries must be answered in the affirmative. Hence we affirm the circuit court.

## I.

Over ten years ago the Soso Field was discovered in the corners of Jasper, Jones and Smith Counties. It has been producing gas from relatively shallow sands for this period. In 1952 the State Oil and Gas Board promulgated special field rules applicable to the production of gas. In 1953 and later oil was discovered in 14 separate pools or reservoirs below the gas producing horizons. Some of these oil reservoirs are of limited extent. Of the 82 wells drilled to produce oil in the field, at the time of the hearing 64 were producing from an oil reservoir known as the -11,701 Bailey Oil Pool. These wells were drilled and operated under the 1952 statewide rules and regulations of the Board. Special field rules for the Soso Field applied at that time only to gas and not oil sands.

By January, 1957, approximately 99.5% in interest of all operating owners and approximately 95.5% in interest of all royalty owners within the productive area of the Soso Field by a voluntary contract entered into a unitization agreement, pooling and consolidating their respective interests in the entire area as to all producible pools in it, beneath the two upper or shallow gas sands. (These percentages apparently have increased subsequently, but it is not proper or necessary for us to consider that.)

The unitization contracts consisted of three lengthy documents: The unitization agreement itself between the royalty and operating owners; an operating parties agreement; and an agreement with regard to reservations of production. For brevity we shall refer to these

three contracts as unitization agreements. They were executed under the authority of Section 10 (e) of the Oil and Gas Conservation Act. Miss. Laws 1948, Ch. 256; see Miss. Laws 1950, Ch. 220. Section 10 (e) provides:

"Agreements made in the interest of conservation of oil or gas, or both, or for the prevention of waste, between and among owners or operators, or both, owning separate holdings in the same field or pool, or in any area that appears from geologic or other data to be underlaid by a common accumulation of oil or gas, or both, and agreements between and among such owners or operators, or both, and royalty owners therein, for the purpose of bringing about the development and operation of the field, pool or area, or any part thereof, as a unit, and for establishing and carrying out a plan for the cooperative development and operation thereof, when such agreements are approved by the board, are hereby authorized and shall not be held or construed to violate any of the statutes of this state relating to trusts, monopolies, or contracts and combinations in restraint of trade."

Mississippi Laws 1956, Chs. 163 and 164 amended the Conservation Act, but did not change this clause. See also Miss. Code 1942, Recomp., Secs. 6132-01 to 6132-51.

In 1956, Gulf and others filed with the Board a petition for approval of the unitization agreements. Proper notice was published of the hearing on this petition. There were no objectors. The Board heard several witnesses for petitioners, and, on December 15, 1956, it adjudicated that these agreements were made in the interest of the conservation of oil, gas and other minerals, and the prevention of waste; that they protected the rights of all owners in the Soso Field, were designed to bring about the co-operative development and operation of the unit area, were reasonable and fair to all interested parties, and did not violate any provisions of existing laws relating to trusts, monopolies or contracts or combinations in restraint of trade. Hence the Board ap-

proved the unitization agreements under the authority of Section 10(e).

Appellants do not contest the validity or fairness of the voluntary unitization agreements approved by the Board in December, 1956. They recognize them as valid. That was a separate proceeding from the instant one, and no appeal was taken from the Board's 1956 order approving these contracts.

In January, 1957, appellee Gulf Oil Corporation filed with the Board a petition for amendments, supplements and revisions of the 1952 Soso Special Field Rules, in order to regulate the producing oil pools below the shallow gas sands. The petition referred to the unitization agreements which the Board had already approved. Gulf suggested certain rules for consideration and adoption. Appellants appeared and objected to the Gulf proposals, and made certain suggestions as to the forms of rules which they thought should be adopted. The Board also had for its consideration the testimony of three witnesses for petitioner, Max Newsom, a geologist for Gulf, Harrol Stanley, a petroleum engineer for Gulf, and Tom P. Caldwell, an attorney and member of the Legal Committee of the Soso Unitization program. Appellants' witness was H. H. Kaveler, a petroleum engineering and managing consultant.

On April 17, 1957, the Board entered the two orders appealed from: First, an order adopting certain amendments and supplements to the Special Field Rules of the Soso Field. The Board found that the rules "will promote the development of all producing pools of oil and gas, bring about the greatest ultimate recovery of oil and gas from the pools, equalize drainage between units, enforce and protest the co-equal and correlative rights of the owners of the common sources of oil and gas, so that each common owner may obtain a just and equitable share of production, and will prevent waste." The pertinent rules and amendments are incorporated in an

Appendix to this opinion, which will be made a part of it.

The second order was one fixing the maximum efficient rate of production (MER) for the -11,701 Bailey Oil Reservoir at 9,600 barrels of oil per day, basing the allocation of oil therefrom upon this MER, and allocating to the individual drilling units and the fieldwise unit the 9,600 barrels in accordance with Rule 2, sub-paragraphs (o), (p), (q), and (r).

Since appellee Gulf took no cross-appeal, we will not consider their proposals for amendments which were not adopted, including an allocation formula, or any issue as to the Board's inclusion in its rules of all 14 of the oil pools. However, we are concerned here only with the -11,701 Bailey Reservoir.

Prior to the 1957 order of the Board amending the Soso Special Field Rules, there were 64 wells producing from the -11,701 Bailey Pool. These wells were on a pattern of 40-acre drilling units in accordance with the then applicable statewide rules. The total acreage assigned to these wells was 3442.02 acres. The MER which the Board had fixed for these wells was 9,600 barrels of oil per day, allocated to producing wells on the statutory basis of surface acreage. The undisputed testimony reflects, however, that the productive limits or areal extent of the -11,701 Bailey Pool underlays an additional 1170.33 surface acres. The geologist who testified for petitioners prepared for the Board's consideration a zero isopach map outlining the zero line of the Bailey Pool, which defines the productive limits or areal extent of that pool. It is undisputed that the entire surface area of the zero line reflected by this map is underlain by productive oil sands of varying thicknesses in this reservoir. In other words, the Board correctly concluded that the -11,701 Bailey Pool underlays not only the acreage previously assigned to the 64 producing wells in the field, but also underlays the additional 1170.33 surface acres, upon which there are no producing wells.

The amended rules created two types of spacing or drilling units. Rule 1 (f) (2) and Rule 1 (g) provide that an individual drilling unit means a developed drilling unit in which any ownership of an operating or royalty interest has not been made subject to the unitization agreement. There are 24 of these individual drilling units in which small fractional interests have not become parties to the unitization agreement. So, under the rules these units remain as 40-acre units. The other category of drilling unit created by the rules is a fieldwise unit, which includes the entire portion of the Soso Field area underlain by the pool, "exclusive of that portion thereof included in any individual drilling unit and also exclusive of the net acreage therein which is attributable to any operating or royalty interest not subject to said Unitization Agreement." Rule 1 (g) ; Rule 1 (f).

The Board's rules, defining the -11,701 Bailey Pool, therefore included the entirety of the area underlain by that reservoir. So their effect was to add to the reservoir area upon which the allocation of oil production was based an additional 1170.33 acres upon which there are no wells, but which are wholly underlain by oil sands. There are 921.01 acres within individual drilling units upon which there are producing wells. There are 2521.01 acres within the fieldwise unit upon which there are producing wells. Since the latter acreage and the added area of 1170.33 acres are owned by royalty and operating interests who have 100% signed the unitization agreement, the fieldwide unit as defined in Rule 1 consists of the total of those figures or approximately 3691.34 acres. Upon this area there are now 40 producing wells. There are 24 producing wells upon the individual drilling units which aggregate 921.01 acres.

Under the 1957 amendments the MER of the field was not changed, and remains 9,600 barrels per day. Under Rule 2 (p) the daily allowable production is allocated to each individual drilling unit in the proportionate part

which "the surface acreage content of such individual drilling unit bears to the total surface acreage contained within all such individual drilling units plus the acreage contained within the fieldwide unit. The remainder of the daily allowable for each pool shall be allocated to the fieldwide unit."

In other words, the Board redefined the areal extent of the pool, adding to the former area 1170.33 acres. It in effect reduced the daily allowable for the field, and then distributed the same on the basis of surface acreage. Whenever there is a 40-acre unit in which there is an unsigned interest, although only a small fractional part, it remains as a 40-acre individual drilling unit. All of the remaining acreage which is 100% signed up under the unitization agreement and which is completely underlain by oil is made into a single fieldwide unit. Wells on that unit can be drilled at such locations as will most efficiently drain the reservoir, subject to certain restrictions as to proximity to the boundary line of individual units and rate of production in offset wells.

The Board found as a fact that the size of the spacing units and the allocation formula would enable the pools to be drained efficiently, to produce the recoverable oil and gas with full protection of the co-equal and correlative rights of all, and without avoidable waste; that they would promote the development of all producing pools and bring about the greatest ultimate recovery of hydrocarbons. Appellants concede that 9,600 barrels of oil per day is the proper MER for the field. They do not contest the zero isopach line of the reservoir which is underlain by oil, as found by the Board.

■■■ The testimony for petitioners of the geologist and petroleum engineer amply supported the findings of fact by the Board which are stated above. This testimony reflects that there have been sufficient wells drilled to the -11,701 Bailey Pool to adequately drain it; and the drilling of additional wells would be unnecessary and wasteful. Under the amended field rules, those who have

signed the utilization agreement will participate in all production from the fieldwide unit irrespective of whether their ownerships are located in the fieldwide unit or in individual drilling units. Appellants' witness, Kaveler, conceded that the only way the field can eventually be fully developed is by unitization, but he took the position that under the Mississippi statute it could be done only if 100% of all interests signed a unitization agreement. He did not differ with petitioners on the basic facts as to the reservoir.

There was ample evidence to support the findings of fact of the Board that the adopted rules would prevent waste, protect the co-equal and correlative rights of the owners, and promote the conservation objective of obtaining the maximum recovery from the producing horizons in the field. Myers, The Law of Pooling and Unitization (1957), Secs. 1.01-1.02; Conservation of Oil and Gas: A Legal History, 1948 (Sec. of Mineral Law, ABA) pp. 3-15; 54 Reps. ABA 741-770 (1929) (Rep. Com. on Conservation of Mineral Resources); Hardwicke, Oil Conservation: Statutes, Administration, and Court Review, 13 Miss. L. J. 381 (1941).

## II.

Appellants contend that the Board does not have the statutory power to prescribe different size units for a pool; that drilling units for a given pool must be uniform in size unless the exception is of less acreage. They rely particularly upon Section 4 (1), in the definition section of the Conservation Act, which defines drainage unit or drilling unit as "the maximum area in a pool which may be drained efficiently by one well so as to produce the maximum recoverable oil or gas in such area." See also Sec. 4 (m). But other sections must be considered along with these provisions.

Sections 6 (c) (11) gives the Board the authority and the duty to make reasonable rules in the proper administration and enforcement of the act "to regulate the spac-

ing of wells and to establish drilling units." This grant of power places no restriction on the Board except that the rule must be reasonable. Section 1 declares the conservation objectives of the statute, among which is to prevent waste, protect the co-equal and correlative rights of the owners, and to obtain the fullest development of the producing pools. The evidence reflects that the spacing adopted by the Board would accomplish these objectives, and the drilling of additional wells would be unnecessary and wasteful, as defined in Section 4 (k). Waste includes "the locating, spacing, drilling, equipping, operating, or producing of any oil or gas well or wells in a manner which results or tends to result in reducing the quantity of oil or gas ultimately to be recovered from any pool in this state." The evidence supports the Board's findings that the spacing adopted would tend to prevent this type of waste.

Section 9 gives the Board the power to regulate the drilling and location of wells in any pool. It has the duty, in order to prevent waste, to "establish a drilling unit *or units* for each pool." (Emphasis added.) Sec. 9 (b); see also Secs. 9 (d), 11 (a).

Section 10 (e), quoted above, authorizing the Board to approve unitization agreements made in the interest of conservation, states that the agreements may be "for the purpose of bringing about the development and operation of the field, pool or area, *or any part thereof,* as a unit. . ." (Emphasis added.) This would seem to be a legislative statement that a voluntary unitization agreement may be made applicable to "any part" of a pool. When this section is read along with the powers of the Board to prevent waste and excessive drilling of wells, and to regulate the spacing of wells and to establish drilling units, it is manifest that the Board has the power to establish spacing units in the prescribed manner. It had the power to create the fieldwide unit, and to create individual drilling units where there were any owners who

had not signed the unitization agreement. The terms of the Act warranted the Board's action in establishing this spacing pattern, to prevent waste and to obtain the greatest maximum recovery from these oil pools, consistent with protection of the co-equal and correlative rights of owners in the common source of supply.

## III.

 With reference to the allocation formula adopted by the Board in Rule 2, Section 6 (c) (12) gives the Board power "to allocate and apportion the production of oil or gas, or both, from any pool or field for the prevention of waste as herein defined, and to allocate such production among or between tracts of land under separate ownership in such pool on a fair and equitable basis to the end that each such tract will be permitted to produce not more than its just and equitable share from the pool." It can allocate production from a reservoir on a fair and equitable basis for the prevention of waste and so that each tract can produce not more than its fair share. The Board found affirmatively that its rules would accomplish this. The evidence supports that finding, and also that the rules would prevent "so far as is practicable, reasonably avoidable drainage from each developed unit which is not equalized by counter-drainage." Sec. 6 (c) (13).

Section 9 (d) prescribes the acreage basis upon which the Board must allocate production:

"Anything herein contained to the contrary, notwithstanding, any allocation or apportionment of production shall be made on the basis of and in proportion to the acreage content of the drilling units prescribed for the producing horizons for the pool, so that each such prescribed unit shall have equal opportunity to produce the same daily allowable, and any special unit of less acreage shall be allowed to produce only in the proportion that the acreage content of any such special unit bears to the acreage content of the regular prescribed unit; pro-

vided, however, that in the event any well in attempting to make its allowable should be operated in a way that would commit waste as herein defined, or to the detriment of the field as a whole, the allowable for any such well shall be subject to adjustment.''

Section 11 (a) directs the Board to allocate or apportion the production ''among the producers in the pool on a reasonable basis so as to prevent reasonably avoidable drainage from each developed unit which is not equalized by counter-drainage, and so that each producer will have the opportunity to produce or receive his just and equitable share. . .'' See also Miss. Laws 1950, Ch. 220; Miss. Laws 1956, Chs. 164, 163. The formula of participation based on surface acres has the merit of simplicity and certainty, but is entirely fair only in the rare cases where formations are uniform in quality and thickness throughout the unit with each tract having beneath it the same amount of reserves per acre. Myers, ibid., Sec. 4.02.

In Humble Oil & Refining Co. v. Welborn, 216 Miss. 180, 62 So. 2d 211 (1953), Humble petitioned for compulsory integration of the interests in four gas drilling units. The Welborns, owners within the units, offered evidence that their tracts had a higher productive capacity, and that therefore the production should not be apportioned on an acreage basis. The Board declined to consider such proof, and was affirmed on appeal. We said the Welborns' contention was foreclosed by Section 9 (d) of the Conservation Law. The legislature ''has fixed surface acreage as the basis for apportionment of production in each unit.''

██ ██ Rule 2 (p) is in accordance with the surface acreage formula of allowables required by Section 9 (d) and the *Welborn* case. Rule 1 (h) directs that the location of wells upon the fieldwide unit ''shall be governed by standards of geology and petroleum engineering designed to promote the greatest ultimate recovery of the

hydrocarbons contained in the pools.'' Appellants contend that, if allowables are set up for the fieldwide unit, they should be allocated only to producing wells on it. If that were done, it would exclude allocating any production to the 1170.33 acres within the fieldwide unit upon which there are no wells. Yet it is undisputed that this acreage is underlain by oil sands, and the wells now located on the fieldwide unit will produce efficiently that area. To adopt appellants' suggestion would be to require appellees to drill unnecessary and wasteful wells on the added acreage, and, if that were not done, it would enable appellants to drain oil from under this area, which would be drainage not equalized by counter-drainage. So the Board was correct in rejecting this contention of appellants, and in drawing within the fieldwise unit the acreage covered by the unitization agreement which is underlain by oil, although no producing wells are located on it.

Appellants complain that the effect of the rules is to cut their allowables from 187 barrels per day for each producing well on an individual drilling unit to a base allowable of 104 barrels per day, which, with adjustments for deficiencies, would aggregate approximately 130 barrels per day. What the Board in fact did was to redefine the field and the reservoirs according to the facts it found at the hearing. It increased the size of the field, because the undisputed evidence reflected that the increased area was underlain with oil of varying depths. Clearly the Board had the power to define the zero isopach line of the pool. Appellants do not assert that action was error. The Board then set the MER for the field at 9,600 barrels of oil per day, which was identical with the MER in existence prior to the 1957 rules. So the effect of the 1957 allowable order was to reduce the MER for each surface acre within the newly defined pool. But no well on the fieldwide unit is authorized to produce more per acre than each well on an individual drilling unit is authorized to produce per acre. The Board carefully adhered to

the statutory requirement of allocation by surface acreage. The reduction in allowable per surface acre, and the redefinition of the field were within the Board's statutory powers, and its actions were supported by substantial evidence.

Rule 2 (q), dealing with the reassignment of allowables from deficient units, is also consistent with the statute. Rule 2 (r) provides that fieldwise unit wells "directly or diagonally offsetting individual drilling units shall not be allowed to produce more than twice the daily allowable assigned to non-deficient drilling units". This is proper and consistent with Rule 34 of the statewide rules, as recognized by appellants' witness, Kaveler.

Rule 2 (r) further states that "no well shall be permitted to operate or produce more than 300 barrels during any 24 hour period and in such manner as to cause waste . . . or otherwise be detrimental to the pool." The Board apparently accepted the testimony of Gulf's witnesses that such production would not constitute waste or drainage not equalized by counter-drainage. Moreover, "production from any such well shall be subject to such adjustment by the Board as it may deem necessary."

## IV.

We do not consider, and this case does not involve, any question of compulsory unitization of an entire oil field or pool. The Board approved and utilized the voluntary unitization agreement in designating the field-wide unit, but it carefully protested the rights of the few owners of small fractional interests within individual units who did not sign the unitization agreement.

██ Dobson v. Arkansas Oil & Gas Commission, 218 Ark. 160, 235 S. W. 2d 33 (1950), involved the validity of an order of the Arkansas Commission attempting to compulsorily unitize an entire oil field. Although recognizing the conservation benefits to be derived from

that action, the court held the commission had no power to order compulsory unitization. However, 97% of the operators and 75% of the royalty owners had signed a voluntary unitization agreement. The court recognized its validity as to the interests covered by it, and said: "There is no equity in the appellants' insistence that they should share in the fruits of unitization while being relieved of its burdens. . ." The Commission had the power and duty to allocate production to non-signing owners only on the basis of production which constituted a withdrawal from the tracts making up the drilling unit in which appellants had an interest. A lessor cannot refuse to enter a unitization agreement and expect to benefit from it. Myers, ibid., Sec. 14.03 (3).

In Tide Water Associated Oil Co. v. Stott, 159 F. 2d 174 (CCA 5th, 1946), a small number of owners who did not sign a unitization agreement sued for damages to the extent of the royalty from condensate which might have been removed from the wet gas under the lands, which had been replaced by dry gas as a result of recycling operations conducted upon other leases in the field. The non-signing plaintiffs had been offered a fair and reasonable unitization agreement. They declined. In denying any recovery of damages, the court held that the defendants-lessees fulfilled any duty of fair dealing which they had to their lessors by offering plaintiffs the right to unitize and to participate. Plaintiffs could not refuse to co-operate with their lessees for their mutual protection and at the same time assert and demand damages. It was said that any damage which they suffered is damnum absque injuria, and such damages were not chargeable to appellants. Myers, ibid., Sec. 14.03 (3).

In the instant case appellants refused, as they had the right to do, to sign the unitization agreement, which they say now they are not attacking and which their brief concedes to be fair in its terms. The reasoning in the *Dobson* and *Stott* cases is sound and a pertinent answer to their contentions. Their individual property

rights are protected, we think, under the Board's rules. In fact, it would appear that in the long run they will get the benefit of the conservation measures taken in the Soso Field without having signed the unitization agreement. At any rate, the Board found that their co-equal and correlative rights as owners in the common source of supply are protected, and the evidence supports that finding. Reading the conservation objectives of the Act together with the powers vested in the Board, and considering them in the light of the evidence in this case, we do not think it would be fair or equitable to permit a very small minority of small fractional owners in this common source of supply of hydrocarbons to prevent the Board and the overwhelming majority of the operating and royalty owners from pursuing a unitization program designed to obtain a maximum recovery from the field. The Board so decided, and at the same time made every reasonable effort to protect the co-equal and correlative rights of appellants.

Affirmed.

All Justices concur.

## APPENDIX

### EXCERPTS FROM SPECIAL FIELD RULES FOR SOSO FIELD, AS AMENDED BY ORDER OF STATE OIL AND GAS BOARD OF APRIL 17, 1957

C. * * * The pools hereinabove defined as B (3) through B (16) are oil pools found at depths below the Eutaw formation with respect to which the Soso Field Unit has been created by voluntary agreement of more than 99% of all of the operating owners and more than 95% of the royalty owners, with respect to which it is proper and necessary for the promotion of conservation to consider and treat the unit area in said pools as a single drilling and producing unit as to all tracts therein contained, subject only to such limitations as may be

required to protect the coequal and correlative rights of all those owners in those tracts who have not by voluntary consent joined in the Soso Field Unit. As to said pools the rules hereinafter provided applicable to them will enable the said pools efficiently to be drilled and to produce the recoverable oil and gas therein contained with full protection of the coequal and correlative rights of all and without avoidable waste.

RULE 1. *SPACING OIL WELLS:*

(f) 1. A drilling unit is hereby established for each and all oil wells drilled and either singly or dually completed in the oil pools hereinabove defined as B (3) through B (16), as consisting of the entirety of the area underlain by such pools within the unit area affected by the Soso Field Unit Agreements; except that portion thereof included in units as defined as subsection 2 hereof.

2. Each oil drilling unit heretofore or hereafter established under the provisions of statewide rules and with respect to which any ownership of an operating or royalty interest has not been made subject to the Unitization Agreement creating the Soso Field Unit shall maintain its status as a drilling unit.

(g) When used in these rules, the words ''individual drilling unit'' shall mean as to each pool defined herein a developed drilling unit now or hereafter existing in the unit area created in accordance with statewide rules wherein any ownership of an operating or royalty interest has not been made subject to the Unitization Agreement creating the Soso Field Unit; and the words ''Fieldwide Unit'' shall mean as to each pool defined herein the entire portion of the Soso Field Unit area underlain by such pool, exclusive of that portion thereof included in any individual drilling unit and also exclusive of the net acreage therein which is attributable to any operating or royalty interest not subject to said Unitization Agreement.

(h) The location of wells upon any individual drilling unit shall be covered by applicable statewide rules promulgated by this Board. The location of wells upon the Fieldwide Unit shall be governed by standards of geology and petroleum engineering designed to promote the greatest ultimate recovery of the hydrocarbons contained in the pools. However, no well in said pools may be drilled nearer than 330 feet from any boundary of the Fieldwide Unit or any individual drilling unit except upon permit issued by the Board, after notice and hearing. No well shall be hereafter completed so as to produce from any oil pool closer than 1,320 feet from any other well producing from the same pool.

RULE 2. *ALLOCATION OF PRODUC-TION: OIL WELLS*

(o) The maximum efficient rate of production of each pool each day shall be determined and fixed by the Board, which shall be such pool's daily allowable production.

(p) The daily allowable of each pool shall be allocated as follows: To each individual drilling unit there shall be allocated that proportionate part of the pool's daily allowable that the surface acreage content of such individual drilling unit bears to the total surface acreage contained within all such individual drilling units plus the acreage contained within the fieldwide unit. The remainder of the daily allowable for each pool shall be allocated to the fieldwide unit.

(q) Any unit which is not capable of producing without committing waste the allowable assigned to it under RULE 2 (p) shall be considered a deficient unit. The difference between the allowable assigned to the deficient unit and that which it is capable of producing without waste shall be distributed by the Board to the non-deficient units on the surface acreage basis of apportionment prescribed in said RULE 2 (p).

(r) The allowable production of any unit as to any pool may be produced by any well or wells on said unit

completed in said pool; provided, however, that no well shall be permitted to operate or produce more than 300 barrels during any 24-hour period and in such manner as to cause waste as defined by the laws of Mississippi or otherwise be detrimental to the pool, and the production from any such well shall be subject to such adjustments by the Board as it may deem necessary, except Fieldwide Unit wells directly or diagonally offsetting individual drilling units shall not be allowed to produce more than twice the daily allowable assigned to non-deficient individual drilling units.