The California Company *v.* Britt, et al.

No. 42680 June 3, 1963 154 So. 2d 144

*Wells, Thomas & Wells,* Jackson, for appellant.

*Allen & Patterson,* Brookhaven; *Breed O. Mounger,* Tylertown, for appellees.

ETHRIDGE, J.

This case involves a claim for drainage by owners of an unsigned, fractional mineral interest, against the operator of a voluntary unitization of an oil field, using a pressure maintenance program. It was approved by the state regulatory agency, and no unit production was on the nonunitized tract.

Howard Britt and others brought this action in the Chancery Court of Lincoln County against The California Company, appellant (called Callifornia), Sun Oil Company, and certain individual defendants. They sought an accounting and damages for a willful and malicious trespass upon an unleased fractional mineral interest owned by complainants, resulting in the alleged wrongful displacement of oil from their property. After hearing, the trial court dismissed the bill as to the other defendants, but held that California, as operator of the Brookhaven Unit, drained oil from under complainants' nonunitized interest, was liable in damages, and ordered an accounting. From this decree it allowed an interlocutory appeal. We hold there is no liability.

I.

Prior to 1939 Perry Britt, predecessor in title of complainants, owned a 20-acre tract of land in Lincoln County. In that year he conveyed one-half of the minerals to certain individuals, and in 1942 deeded one-fourth of the minerals to another person. This one-half mineral interest is under lease to California, and the one-fourth to Sun Oil Company, and are committed to the Brookhaven Unit. In 1944 Perry Britt and wife

executed an oil, gas and mineral lease to Sun, covering his one-fourth mineral interest in the 20-acre tract, and in other land. This lease was for a primary term of ten years, and expired in June, 1954. No well has been drilled on this tract, or land pooled with it. Since 1954 complainants have not executed any lease or other agreement affecting their one-fourth mineral interest in this 20-acre tract. It is located in the Brookhaven Field, which was discovered in 1946. A number of wells were drilled by 1948.

Section 10(e) of the Oil and Gas Conservation Act authorizes the State Oil and Gas Board to approve agreements made in the interest of the conservation of oil and gas and the prevention of waste, between and among owners or operators in the same field or pool, in order to bring about development and operation of the field as a unit, and to establish a plan of cooperative development. Such agreements must be approved by the board. Miss. Laws 1948, ch. 256, §10; Miss. Laws 1950, ch. 220, §3; Miss. Code 1942, Rec., §6132-22. Voluntary unitization agreements, dated September 1, 1947, were entered into by 98.39 percent of the royalty owners and 99.73 percent of the working interest owners in the Brookhaven Field. They were contained in two contracts, designated "Brookhaven Royalty Owners Unitization Agreement", and "Brookhaven Unit Operating Agreement". California was designated as operator of the Brookhaven Unit.

The board approved both of these unitization agreements, which became effective June 1, 1948. Its order found they were in the interest of conservation, and prevention of waste in the field, and were for the purposes of carrying out a plan for cooperative development of the parties to the agreements. This order was within the powers of the board, and neither appellees nor their predecessor in title took an appeal from it.

In 1952 the board promulgated special field rules for the Brookhaven Field. They defined the field as consisting of twenty-four sections of land. The order found that 99 percent of the operating parties in the field, and 95 percent of the royalty owners (at that time), had voluntarily unitized their interests for pressure maintenance purposes, and that a pressure maintenance program was in operation to effect the greatest recovery of oil and gas from the Tuscaloosa pool. It concluded that "the unitized area of the field, known as the 'Brookhaven Unit' should be developed, produced, and operated as a single unit without regard to the boundaries established by land, mineral, and lease ownerships." Hence Rule 1 established two types of units in the field: one consisting of the Brookhaven Unit, applicable to all interests which signed the voluntary unitization agreements, and two, 40-acre drilling units applicable to interests which have not signed the unitization agreements. Rule 1 states:

"A. The Brookhaven Unit is hereby established as a single producing unit and the location of wells thereon and the rates of production therefrom shall be governed by standards of geology and petroleum engineering in order to effect the greatest recovery of oil and gas from the pool. However, no well may be drilled nearer than 330′ from the exterior boundaries of the Brookhaven Unit.

"B. A drilling unit is hereby established for each and all oil wells drilled to the Lower Tuscaloosa Pool, *excepting those in the Brookhaven Unit,* as an area consisting of a governmental quarter quarter section." (Italics added)

 The board had the power to create in the field units of different sizes. Specifically, it had the power to create by this rule the field-wide unit, and individual drilling units where there were owners who had not signed the unitization agreements. Corley v. Miss. State

Oil & Gas Bd., 234 Miss. 199, 211-213, 105 So. 2d 633 (1958), held to this effect. In short, Rule 1A designated the unitized area of the field as the Brookhaven Unit. It was considered as a single producing unit participated in by all parties who signed the voluntary agreements. Rule 1B then established a second type of unit in the field, being 40-acre units, but not including those interests voluntarily placed in the Brookhaven Unit.

Appellees' erroneous, basic premise is that the board's order placed their one-fourth mineral interest in the Brookhaven Unit. It did not do this, but, in effect, expressly excluded from the Brookhaven Unit the interests of owners who had not signed the unitization agreements. This is substantially similar to that which was done and approved in *Corley*. Hence the Britts are not in the Brookhaven Unit, are not participants in it, and have no rights or duties under those agreements.

No well has been drilled on the 20-acre tract in which since 1954 the Britts have held a one-fourth unleased mineral interest. In December 1959 California completed, under a unit permit from the board, a producing oil well known as Brookhaven Unit No. 16, south of the 20-acre tract in question. There were a number of other unit wells in the area covered by the Brookhaven unitization agreements, but none were on the 20-acre tract. California, as operator of the Brookhaven Unit, made offers to Perry Britt to join the unitization before October 1947, and subsequent to his death made continuing offers to his successors in title to join the unit in accordance with the terms of the royalty owners unitization agreement and the several revised schedules of participation. The Britts' one-fourth interest was under lease to one of the participating parties in the unit until 1954. Appellees and their predecessor have declined to enter into the unitization agreements. In 1959 appellees also refused California's offer to purchase an oil, gas

and mineral lease from them for a bonus of $100 per acre.

Other than documentary evidence and a stipulation, the only evidence offered was by complainants, the testimony of a petroleum engineer. He had previously worked in and made a study of the Brookhaven Field. He concluded that the 20 acres, in which complainants owned a one-fourth mineral interest, originally contained 233 acre feet of oil bearing sand, for a total of 206,438 barrels of stock tank oil in place. As of December 1959, the oil bearing sand, he calculated, was 59 acre feet, indicating a total drainage of 131,378 stock tank barrels. He said that, after production began from the field in 1946, there was a rapid decline of pressure in the reservoir, which dropped close to the ''bubble point.'' Voluntary unitization of the field and the institution of the pressure maintenance program prevented the ''bubble point'' being reached.

Construction of a compressor station, to pump gas back into the ground after stripping the wet gas, substantially increased the recovery, the engineer stated. For this secondary recovery program, it was necessary to purchase gas from the Gwinville Field. The percentage of oil or hydrocarbons recoverable under a primary program, without any pressure maintenance, was 30.75 percent of those in place. The pressure maintenance program almost doubled the ultimate recovery, to approximately 60 percent. Absent a pressure maintenance program, the drainage would have been 65,689 stock tank barrels. In relation to the geographical boundaries of the sands, the land in question was an edge or marginal tract. In ordinary production of the field, this tract would have flooded out sooner than the others.

## II.

The theory of complainants' bill was a willful and malicious trespass by the defendant. Yet they failed to show that California committed any actionable wrong

or breach of duty toward them. It drilled no well on the 20 acres in which appellees owned an unleased one-fourth mineral interest.

Sun had no lease from them after 1954. Prior to that time, California offered appellees participation in the unit. The Brookhaven Unit was validly created, and was approved by the State Oil and Gas Board. Unit wells have been drilled in accordance with permits from the board. The board found that the unitization agreements would conserve natural resources, prevent waste, and result in a larger ultimate recovery from the field. Appellees' evidence confirms this.

██ Since there was no invasion of appellees' mineral interest by drilling a well on it, and all of California's activities have been in accord with the requirements of the conservation act and orders of the board, this is one of those cases, somewhat unusual today, where the law of capture applies: ██ The owner of land "acquires title to the oil or gas which he produces from wells on his land, though part of the oil or gas may have migrated from adjoining lands. He may thus appropriate the oil and gas that have flowed from adjacent lands without the consent of the owner of those lands, and without incurring liability to him for drainage." Elliff v. Texon Drilling Co., 146 Tex. 575, 210 S. W. 2d 558, 561 (1948); Myers, The Law of Pooling and Unitization, Voluntary — Compulsory (1957), §1.03; Pace v. State ex rel Rice, 191 Miss. 780, 4 So. 2d 270 (1941); Merrill Engineering Co. v. Capital Nat'l Bank, 192 Miss. 378, 5 So. 2d 666 (1942); see also Superior Oil Co. v. Beery, 216 Miss. 664, at 719, 64 So. 2d 357, at 360 (1953); 58 C.J.S., Mines and Minerals, §134a(2), p. 216; Stevens, Property Rights in Oil and Gas in Mississippi, 13 Miss. L. J. 427 (1941); Shanks, Present Status of the Law of Capture, 6th Annual Institute on Oil and Gas Law and Taxation 257 (1955).

The wells drilled by California and others in the Brookhaven Unit have been drilled on lands in which appellees have no interest whatever. Since California has not trespassed upon appellees' land, has not drilled a well on it, and has violated no rights of appellees, it is not liable to them in tort. Hoffman, analyzing this question as to nonunitized, unleased mineral interests located in a unit area, concludes that where the state regulatory agency "authorizes such an operation and it is conducted in accordance with the authorization, there should be no liability in tort to the owners of the nonunitized interest." Hoffman, Voluntary Pooling and Unitization (1954), pp. 232-233. Nor is there any contractual basis upon which California would be liable to appellees. It is not a party to any lease or other agreement with them.

Appellees argue that this case is governed by the doctrine of equitable, de facto pooling. Superior Oil Co. v. Beery, 216 Miss. 664, 63 So. 2d 115, 64 So. 2d 357 (1953); Griffith v. Gulf Ref. Co., 215 Miss. 15, 60 So. 2d 518, 61 So. 2d 306 (1952); Hassie Hunt Trust v. Proctor, 215 Miss. 84, 60 So. 2d 551 (1952). These cases held that, where lands are included in a unit and the lessee and producer gets the benefit of the inclusion of that tract in it, the latter is estopped from asserting that the included lands are not part of the unit and are not entitled to participate in the production from it.

The equitable pooling doctrine is not applicable here, because California has never considered appellees' mineral interest as within the unit, appellees have denied it is and have refused to join the unit, they have not executed the unitization agreements, and the order of the board defines the unit as not including interests of owners who are not parties to the unitization agreements. Moreover, in this argument appellees are on the horns of a delemma: If equitable pooling should apply, appellees' interest would be bound by the unitiza-

tion agreement, even though they did not sign it, and their rights would be as royalty owners, since their interest was under lease to one of the operating parties until 1954, and production from the unit would have continued the lease thereafter. On the other hand, since Mississippi does not have compulsory pooling, and the equitable pooling doctrine is inapplicable, appellees are not parties to the unitization agreements, have no contractual relationships with California or the other contracting parties, and there has been no production from a well on appellees' tract.

██ ██ The owner of a mineral interest who neither has leased (with cotenants) nor unitized cannot recover for an interest in production from other land in the unit. Boggess v. Milam, 127 W. Va. 654, 34 S. E. 2d 267 (1945), is substantially similar to the instant case. See Simmons, Problems of the Tract in Which All or a Portion of the Interested Parties Do Not Agree in Unit Operation, 3rd Institute on Oil and Gas Law and Taxation 161, 168 (1952). Two tracts of 53 acres and 116 acres were unitized by agreement of all owners, except the plaintiff, who owned a one-tenth mineral interest in the 116-acre tract. A gas well was completed on the 53-acre tract. Plaintiff sued to recover his alleged proportionate interest in the value of the production from that well, contending the unitization agreement, to which he was not a party, had merged the titles of the two tracts for operating purposes, making him a tenant in common with the owners of interests in both tracts, and asserting in equity that he was entitled to participate in the unit production. The court rejected this argument, and held that since he had not joined in the unitization, he was entitled to no part of the production from the tract in which he had no interest. The court there said:

"In our opinion, the so-called unitization agreement does not effect a merger of title. Under its express terms the leases of the fifty-three acres and of the one

hundred and sixteen acres not in conflict with its terms remained in effect. It consolidates only the contractual interests under the leases to the United Fuel Gas Company. Boggess having refused to become a party to the lease of the one hundred sixteen acre tract, acquired no contractual right subject to merger, and by remaining aloof, both from the lease and the unitization agreement, neither instrument affected his interest, either favorably or unfavorably.

". . . All we mean to hold is that a tenant in common, particularly one holding a minor interest in the oil and gas, is not to be allowed by withholding his consent to the development of the boundary in which his interest lies, to prevent the development of an adjoining tract under a unitization agreement to which he has been given an equal opportunity to become a party and in which his cotenants have all joined." See Hoffman, pp. 204-206.

Myers analyzes *Boggess* in this manner: "If there is no production from the tract in question, the unsigned royalty interest in the absence of equitable considerations receives nothing though there is production elsewhere in the unit." Myers, The Law of Pooling and Unitization, Voluntary — Compulsory (1957), §14.04.

The decision in *Boggess* applies to the instant case. The unitization agreements consolidated only the interests of those who executed them. The Britts had no contractual rights in the unitization. The board's rules excluded any unsigned interests from the Brookhaven Unit. And finally, under the law of capture complainants have no claim in tort against California.

## III.

The Britts' claim also fails to fall within the ambit of any additional equitable considerations developed in the cases dealing with secondary recovery operations. These factors are illustrated by the following cases.

Tidewater Associated Oil Co. v. Stott, 159 F. 2d 174 (C. A. 5th, 1946), denied damages to plaintiffs who had declined to sign a unitization agreement, involving recycling operations conducted upon other leases in the field. Note, 25 Tex. L. Rev. 690 (1947). They could not refuse to cooperate with their lessees for their mutual protection, and at the same time assert and demand damages. Complainants' position in the instant case is weaker than in *Stott,* because in the latter plaintiffs were lessors with contractual relations with the lessees-defendants, but here complainants have no contractual relations whatever with California. *Stott* was followed in Syverson v. N. D. State Industrial Commission, 111 N. W. 2d 128 (N. D. 1961), and Dobson v. Ark. Oil & Gas Comm., 218 Ark. 160, 235 S. W. 2d 33 (1950).

These principles were further developed in Corley v. Miss. State Oil & Gas Board, 234 Miss. 199, 105 So. 2d 633 (1958). Note, 31 Miss. L. J. 100 (1959). Owners of small fractional interests, who declined to sign a voluntary unitization agreement, attacked the board's order approving the agreement. It was held that, although appellants had the right to refuse to sign, it was not ''fair or equitable to permit a very small minority of small fractional owners in this common source of supply of hydrocarbons to prevent the board and the overwhelming majority of the operating and royalty owners from pursuing a unitization program designed to obtain a maximum recovery from the field.'' Further, ''the reasoning in the Dobson and Stott cases is sound and a pertinent answer'' to appellants' contentions. 234 Miss. at 216-218.

For further analysis of this and related problems, see Myers, §14.03, and supp.; Hoffman, pp. 216-232; Carter Oil Co. v. Dees, 340 Ill. App. 449, 92 N. E. 2d 519 (1950); Hoffman, Legal Problems in Pooling, Unitization, and Joint Operation of Oil and Gas Interests, 11th Annual Institute on Oil and Gas Law and Taxation

331, 372-376 (1960); Eberhardt, Effect of Conservation Laws on Rights of Lessors, Lessees and Owners of Unleased Mineral Interests, 5th Annual Institute on Oil and Gas Law and Taxation 125, 174 *et seq.* (1954); Myers, Legal Problems Incident to Operation of a Unit, 8th Annual Institute on Oil and Gas Law and Taxation 255, 305 *et seq.* (1957); Hughes, Legal Problems of Water Flooding, Recycling and Other Secondary Operations, 9th Annual Institute on Oil and Gas Law and Taxation 105, 123-127 (1958); Shanks, Pooling Problems, 28 Tex. L. Rev. 662, 674 (1950); Merrill, Unitization Problems: The Position of the Lessor, 1 Okla. L. Rev. 119, 128 (1948); Merrill, Implied Covenants, Conservation and Unitization, 2 Okla. L. Rev. 469, 478 (1949); Merrill, Implied Covenants and Secondary Recovery, 4 Okla. L. Rev. 177 (1951).

Moreover, appellees' proof of drainage of oil from under their tract is indefinite. The petroleum engineer compared the volume of oil originally in place to the volume in place as of December 1959. There is no evidence as to the extent of drainage between the date of first production in the field and the date of creation of the Brookhaven Unit, June 1, 1948; as to whether the drainage was caused by unit wells or privately owned wells; as to whether the drainage occurred before or after expiration of the Britts' lease in 1954; and as to its extent during these several periods, and from these respective sources.

However, evidence of drainage alone is not sufficient to support a cause of action. The foregoing authorities require the application here of competing and controlling factors. The law of capture negatives a valid claim. There are no contractual relations between the parties. Under the police power of the state, the state regulatory authority approved the unitization program for those who desired to join it. Appellees do not, yet they want the benefits without the duties of

the contracting parties. Since 1947 they and their predecessor in title have been offered participation in the unitization, but they have declined it. Hence they have no standing in law or equity to recover in this suit.

 Owners of royalty or unleased mineral interests are entitled to come into a unitization program under fair, reasonable, and equal terms with other participants in the unit, similarly situated. The ideal is that each operator's share of production from the unit should be in exact proportion to the contribution which he makes to the unit. Myers, p. 77. The basis of participation in production is a complex factor. Essentially, the unsigned or ''window'' interest would have to join in the unitization on the basis of equal, proportionate participation with others who are parties to the agreement, although delay in entering the unit may affect the degree of participation if there is a reasonable basis for that element. The participation formula in the unitization agreement itself, a voluntary contractual undertaking, is ordinarily the controlling factor. See Doggett, Practical Legal Problems Encountered in the Formation, Operation and Dissolution of Field-Wide Oil and Gas Units, 16 Okla. L. Rev. 1, 52-58 (1963).

 In the present case, appellees, with the burden of proof, fail to show that they were offered an unreasonable, unfair, and unequal participation in the unit along with other owners. Sun Oil Company, one operating party, had a lease on appellees' one-fourth interest until 1954, for over six years after the unit was created. Appellees consistently refused to sign the unitization agreement as royalty owners during that period. Thereafter, California was not obligated indefinitely to continue offering them a participation as nonunitized mineral owners.

Reversed and judgment rendered for appellant.

*McGehee, C. J., and Arrington, McElroy and Rodgers, JJ.,* concur.