[1] In their brief the appellees note that at trial Earnest H. Stryker and Cecil A. Brown in their individual capacities, were dismissed from this action because they were not the legal owners of the subject property in this case: instead their wives Dorothy J Stryker and Doris J Brown were the legal owners of the properly. For this reason, although the filings of the appellant and those of the appellees are styled Phillips Petroleum Companyv. Earnest H. Stryker, et al., this court has named the appellees as Dorothy J. Stryker et al. The trial courts judgment referred to the plaintiffs as "Earnest H. Stryker, et al. while its order denying Phillips's post-judgment motions referred to the plaintiffs as Dorothy J. Stryker et al. As the appellees note there are now 47 plaintiffs-appellees, rather than the original 49 plaintiffs at the trial court (those original 49 included the present appellees and also the dismissed plaintiffs Earnest H. Stryker and Cecill A. Brown). Therefore, Earnest H. Stryker and Cecil A. Brown in their individual capacities are not parties to this appeal although they still are plaintiffs along with their wives as co-trustees of their children's estates.
Phillips Petroleum Company ("Phillips") appeals from a judgment based upon jury verdicts in favor of Dorothy J. Stryker, Doris J. Brown, and 45 other plaintiffs (all hereinafter collectively referred to as "the plaintiffs"), who possessed interests in property outside a parcel of land known as "the Chatom Unit" in Washington County. The plaintiffs alleged claims of fraud, negligence, wantonness, trespass, conversion, nuisance, and breach of implied lease covenants, stemming from Phillips's alleged drainage of the plaintiffs' lands by its oil and gas recovery operations on the Chatom Unit. The jury returned a verdict in favor of Phillips on the plaintiffs' claims alleging wantonness and breach of implied lease covenants. The jury returned four verdicts of $4,197,439.07 each on the fraud, nuisance, conversion, and negligence claims. It awarded $8,755,420.64 on the trespass claim and $16,519,661.40 in punitive damages for all of the claims. The plaintiffs requested that the court reduce the amount of compensatory damages, stating that the damages awarded on some of the claims were duplicative. Acceding to the plaintiffs' request, the trial court entered a judgment of $26,852,223.94. The trial court denied Phillips's motion for a JNOV or a new trial, and refused to order a remittitur of the punitive damages.
 Facts
The Chatom Unit is a parcel of property drilled for oil and gas by Phillips; it is an amalgamation of several parcels of land combined into one "unit" under the authority of the State of Alabama Oil and Gas Board for the purpose of creating a "secondary recovery" operation on the property. See Ala. Code 1975, § 9-17-13, regarding secondary recovery operations. The Board created the Chatom Unit on April 22, 1976, after being petitioned to do so by Phillips. Secondary recovery, in the context of this case, occurs when a company, such as Phillips, injects dry gas into the ground to stimulate an increase in the underground pressure, which in turn increases the amount of oil and gas that can be recovered from the property. A secondary recovery unit is formed by the Oil and Gas Board when it grants a petition from a party, such as Phillips, requesting the consolidation of certain property for the purpose of placing secondary recovery operations on that property ("unitization.")
The petitioner for the unit provides the Oil and Gas Board with information concerning the property the petitioner requests to be placed inside the unit; then a public hearing is held on the proposed unitization. At least 75% of the royalty owners of the property within the proposed boundaries of the unit must agree to the unitization of the properties. 9-17-84. The owners of the various properties share in royalties obtained from the drilling of the unit, and the ensuing pressure buildup from the secondary recovery operation benefits all of the property in the unit. The Oil and Gas Board's purpose in creating a unit is to prevent the waste of oil and gas and to prevent the drilling of unnecessary wells. See § 9-17-13 (b) ("The board, in order to prevent waste and avoid the drilling of unnecessary wells, . . . is also authorized to permit or require the introduction of gas or other substance into an oil or gas reservoir for the purpose of repressuring such reservoir, maintaining pressure or carrying on secondary recovery operations.").
In its 1976 order creating the Chatom Unit, the Board authorized the unit as necessary to prevent the waste of the oil and gas. In creating the unit, the Board established the boundaries of the unit and the manner in which the unit production would be divided among Phillips and the owners of interests in the unit. Since 1976, the Chatom unit has been producing gas and gas condensate and Phillips has been distributing royalties to the owners of the properties within the unit. *Page 587 
The plaintiffs own interests in properties lying outside the Chatom Unit; the properties are in Sections 19 and 30.[2] When the unit was formed, Phillips held leases on Sections 19 and 30. The plaintiffs' claims against Phillips were based upon their allegations that Phillips had committed fraud by withholding from the Board information that would indicate that Sections 19 and 30 were productive; that Phillips had wrongfully drained their property; that Phillips had committed waste in its operation of the Chatom Unit by failing to recover all of the gas that lies under their property; and that Phillips's injection of gas into the ground constituted a trespass onto their property. Phillips argued that, when the unit was formed, it considered Sections 19 and 30 to be unproductive, and that the inclusion of those sections would have diluted the royalties stemming from the productive properties.
In 1975, before the unitization in question, several of the plaintiffs, including Mr. and Mrs. Stryker and Mr. and Mrs. Brown (see note 1), employed an attorney to attempt to persuade Phillips to release its leases on Sections 19 and 30, which had been executed in 1969 and 1970. In a letter to Phillips, the attorney specifically noted that his clients had received materials concerning the proposed unitization of Chatom Field, and he declared that Sections 19 and 30 were being drained by Phillips's Chatom Field wells.
Phillips did not agree to release the leases until 1982. Beginning at that time, the plaintiffs were able to lease their properties or to drill their property for oil and gas. In 1983, some of the plaintiffs formed a company in an attempt to start drilling on Sections 19 and 30. They requested that Phillips "farm out" (in oil and gas vernacular, to allow some of its leased land to be drilled by a second company) some of its property near the property in which they were interested in drilling, so that they could form a 460-acre drilling unit, but Phillips refused to do so. No further development arose from this attempt. In 1985, the plaintiffs executed new leases on their property to Gulf States Land Services, which asked Phillips to farm out some of its property; Phillips initially declined, but later agreed. Gulf States was unable to find investors for its drilling project. In 1987 Gulf States again requested Phillips to farm out acreage in order that it could place a new well drilled 660 feet from the Chatom Unit, rather than 1,320 feet as required by the Board, and Phillips did not agree with Gulf States' proposals regarding the project. Phillips was also unwilling to share with Gulf States its seismic research, a very expensive research usually treated as a trade secret. No drilling was ever done by Gulf States.
In 1990, Hickox Oil Company became interested in drilling Section 19, and it requested Phillips to farm out some of its nearby acreage; Phillips declined to do so. Hickox never drilled on the property. No drilling from any company occurred on the plaintiffs' property. It should be noted that Phillips had no contractual or legal duty to farm out its property for the drilling purposes of other companies or individuals.
In general, as noted above, the plaintiffs' claims alleged that Phillips had improperly drained their land of gas and gas condensate; that Phillips caused a waste of condensate; and that Phillips had acted fraudulently in failing to disclose the extent to which their property was being drained. According to the plaintiffs, Phillips had withheld data from the Board indicating a common pool of oil and gas shared by Sections 19 and 30 with the property included in the unit. Phillips also failed to file annual reports regarding pressure readings from the wells drilled in the Chatom unit in 1989, 1990, and 1991; the reports were finally submitted to the Board in 1992.
Phillips maintained that no improper drainage had occurred, because of the "rule of capture": it maintained that no waste was caused; and it denied withholding information from the Board. It admitted having failed to supply the Board with the pressure reports, but it pointed out that it caught up on its reports by filing them later, and it denied that any fraud had occurred. Phillips also argued that the plaintiffs had had the right to ask the Board to place their properties *Page 588 
within the confines of the Chatom Unit when it was formed, but failed to do so. Phillips contended that the plaintiffs had failed to exhaust their administrative remedies and that their action was an impermissible collateral attack on the Board's order creating the Chatom Unit.
 Discussion
Phillips has raised numerous arguments on appeal, regarding these issues and others, for the reversal of the judgment in this case. We address only the propriety of this action against Phillips regarding the Chatom Unit (as noted above, Phillips argues that this action is an impermissible attack on the April 22, 1976, order of the Board creating the Chatom Unit) and Phillips's argument that the plaintiffs failed to exhaust their administrative remedies.
"The prevention of waste of oil and gas and the protection of correlative rights are declared to he in the public interest. The purpose of this article is to prevent such waste and to protect correlative rights." Ala. Code 1975), § 9-17-2. The State of Alabama, in creating the Oil and Gas Board in Title 9, Chapter 17, Article 1, Ala. Code 1975, declared the preceding as the public policy of this State regarding oil and gas. The Oil and Gas Board regulates the Alabama oil and gas industry through an extensive statutory scheme, beginning with Ala. Code 1975, §9-17-1, and it has, over all persons and property, such jurisdiction and authority as are necessary for the conservation of oil and gas. It has the power to investigate oil and gas operations, it maintains records and data concerning these operations, and it may make regulations and issue orders affecting the production of oil and gas. Ala. Code 1975 § 9-17-6.
Among these powers, as discussed above, is the power to create units for the purpose of secondary recovery § 9-17-13. The secondary reconvey unit provides additional recovery of oil and gas in an efficient manner. Hemingway, Law of oil and Gas § 7.13 (3d ed. 1991). The creation of these units, which, as noted above, prevents waste and the drilling of unnecessary wells, precisely corresponds with the Oil and Gas Board's purpose of preventing oil and gas waste.
It is an established fact that the maintenance of reservoir pressure is essential to secure the greatest ultimate recovery of oil and gas. Summers, Oil and Gas § 76 (2d ed. 1954). Secondary recovery unitization, in the proper circumstances (i.e., when data gathered from a site indicates that secondary recovery operations are needed to prevent waste and increase production), should be encouraged in this State, and the Oil and Gas Board must be free to determine, in its discretion, the proper unitization of areas in need of those secondary recovery operations. In a situation such as that involved in this case, the unitization not only benefits the party petitioning for the unit (Phillips), but also the landowners or owners of mineral interests whose property or interests lie within the proposed unit.
Clearly, actions such as that brought by the plaintiffs in this case, which directly concern a unit's alleged drainage of properties lying outside the unit, could substantially impede secondary recovery operations in this State. The plaintiffs' action seriously calls into question the substance of the Oil and Gas Board's orders regarding secondary recovery unitization.
The primary basis for the plaintiffs' claims have been that Phillips has drained Sections 19 and 30 through its operations in the Chatom Unit. Many courts have addressed similar issues and have held that no viable cause of action existed under similar circumstances. Of particular interest is Baumgartner v. Gulf OilCorp., 184 Neb. 384, 168 N.W.2d 610 (1969), cert. denied,397 U.S. 913, 90 S.Ct. 914, 25 L.Ed.2d 93 (1970). In that case, an oil and gas leaseholder sued a secondary recovery unit operator, alleging trespass and conversion and arguing that the unit had taken oil and gas from his property. The leaseholder had had the opportunity to join the unit, but had refused. After reviewing the Nebraska oil and gas statutes, the Nebraska Supreme Court reversed a judgment in favor of the leaseholder, stating:
 "We cannot ignore the fact that the operation of [the unit] was specifically authorized and approved by [the Nebraska Oil *Page 589 
and Gas Conservation Commission] . . . and that the project was at all times conducted in conformity with the order of the commission. . . .
 "We have reached the conclusion that where the primary recoverable oil has been exhausted, all interested parties in the field must be offered an opportunity to join in any unitization project to recover secondary oil on a fair and equitable basis, and if any interested party refuses to join he should not be permitted to capitalize on that refusal. To hold otherwise would discourage unitization and encourage rather than avoid waste. Consequently, we hold where a secondary recovery project has been authorized by the commission the operator is not liable for willful trespass to owners who refused to join the project when the injected recovery substance moves across lease lines."
184 Neb. at 393-94, 168 N.W.2d at 516.
In California Co. v. Britt. 247 Miss. 718, 154 So.2d 144
(1963), owners of mineral interests whose property lay outside a unit approved by the Mississippi Oil and Gas Board sued the unit's operator, alleging that the unit had drained their property. The mineral-interest owners had had the opportunity to join the Unit, but did not do so. The Mississippi Supreme Court held that the mineral-interest owners could not recover damages against the unit operator, stating:
 "The theory of complainants' bill was a willful and malicious trespass by the defendant. Yet they failed to show that California [the unit operator] committed any actionable wrong or breach of duty toward them. It drilled no well on the 20 acres in which appellees owned an unleased one-fourth mineral interest.
 Sun [a former leaseholder] had no lease from them after 1954. Prior to that time, California offered appellees participation in the unit. The Brookhaven Unit was validly created, and was approved by the State Oil and Gas Board. Unit wells have been drilled in accordance with permits from the board. The board found that the unitization agreements would conserve natural resources, prevent waste, and result in a larger ultimate recovery from the field.
 "Since there was no invasion of appellees' mineral interest by drilling a well on it, and all of California's activities have been in accord with the requirements of the conservation act and orders of the board, this is one of those cases, somewhat unusual today, where the law of capture applies: The owner of land `acquires title to the oil or gas which he produces from wells on his land, though part of the oil or gas may have migrated from adjoining lands. He may thus appropriate the oil and gas that have flowed from adjacent lands without the consent of the owner of those lands, and without incurring liability to him for drainage.' "
247 Miss. at 726-27, 154 So.2d at 147. (Citation omitted.)
While the plaintiffs alleged that Phillips committed fraud by failing to disclose what they allege to be data indicating that a common reservoir extended from the Chatom Unit to Sections 19 and 30, it is clear that Dorothy Stryker, one of the two plaintiffs who testified, believed that her land was being drained, without any reliance on Phillips's disclosure or nondisclosure of such data. As noted above, the Strykers and Browns employed an attorney to write a letter, dated October 22, 1975, to Phillips, regarding Phillips's leases; in that letter, the attorney for the Strykers and the Browns stated:
 "[I]t is our position that my clients have suffered drainage from their lands in Sections 19 and 30 as a result of production from Phillips' wells in the Chatom Field."
Marc Bradley, the other plaintiff who testified, attempted to obtain farm outs of the Phillips leases in Sections 19 and 30 before the years in which Phillips failed to file pressure reports with the Board. Thus, he could not have relied on Phillips's failure to file those reports.
We conclude that, under the circumstances of this case, the plaintiffs' claims against Phillips amounted to an improper collateral attack on the Oil and Gas Board's order of April 22, 1976, creating the Chatom Unit. In that order, the Oil and Gas Board expressly *Page 590 
found that the Unit was being created to prevent waste and to protect the rights of all the owners of interests in the unitized area. The manner by which one may attack a rule, regulation, or order of the Oil and Gas Board is set out in Ala. Code 1975, §9-17-15. In Mize v. Exxon Corp. 640 F.2d 637 (5th Cir. 1981), the United States Court of Appeals for the Fifth Circuit. examined § 9-17-15 in ruling on a dispute between landowners and a unit operator; the landowners had alleged that the unit operator had drained their land. The court stated:
 "Alabama law provides for the Board's issuance of orders creating units. These orders are subject to judicial review in the manner provided by Ala. Code tit. 26, § 179(38) (1958) (now Ala. Code § 9-17-15
(1975)):
 "'Any interested person aggrieved by any rule, regulation or order made or promulgated by the board under this article and who may be dissatisfied therewith shall within 30 days from the date said order, rule or regulation was promulgated, have the right, regardless of the amount involved, to institute a civil action by filing a complaint in the circuit court of the county in which all or part of the aggrieved person's property affected by any such rule, regulation or order is situated to test the validity of said rule, regulation or order promulgated by the board. Such civil action shall be advanced for trial and be determined as expeditiously as feasible, and no postponement or continuance thereof shall be granted except for reasons deemed imperative by the court. In such trials the validity of any rule, regulation or order made or promulgated under this article shall be deemed prima facie valid, and the court shall be limited in its consideration to a review of the record of the proceedings before the board, and no new or additional evidence shall be received.
 "'The revieving court shall limit its consideration to the following:
 "'(1) Whether the rule, regulation or order is constitutional:
 "'(2) Whether the rule, regulation or order was without or in excess of jurisdiction;
 "'(3) Whether the rule, regulation or order was procured by fraud;
 "'(4) Whether the rule, regulation or order is unreasonable; and
 "'(5) Whether the rule, regulation or order is unsupported by the evidence.'
 "The, judicial review provided by Alabama law is specifically limited to a consideration of the proceedings and evidence before the Board and is not a trial de novo. Orders by administrative agencies frequently are subject to limited judicial review and generally are not subject to collateral attack. The Mizes attempt to pursue such an attack. We conclude that they may not do so. . . .
". . .
 ". . . Presumptively, the very purpose of unitization, whether voluntary or enforced, is to determine and place within a productive unit the area to be drained. The exclusion of land from within a unit is, necessarily, a determination that it will not be drained by a well or wells on the adjacent properties."
640 F.2d at 639-41. (Emphasis added.)
At no time did the plaintiffs attempt to comply with §9-17-15. In addition to that statutory provision, § 9-17-85
provides for the Oil and Gas Board to amend its orders to extend the unit area; the plaintiffs had the right (and continue to have the right) under that section to petition the Board to conduct another hearing and to add Sections 19 and 30 to the unit, but they have not done so. Section 9-17-85 (a) provides:
 "The board, by entry of new or amending orders, may from time to time add to unit operations portions of pools not theretofore included and may add to unit operations new pools or portions thereof and may extend the unit area as required."
The plaintiffs have never sought to have their property included in the Chatom Unit. The proposed unitization of Chatom Field in 1976 was preceded by adequate notice. As noted above, the Strykers and the Browns believed that Phillips's operations in the Chatom *Page 591 
Field were draining their properties in 1975, before the Chatom Unit was created; yet they never asked to have their interests included in the unit. Bradley, the only plaintiff who testified, other than Mrs. Stryker, also failed to petition to have his property included in the Chatom Unit. When questioned about his failure to do so, Bradley stated:
 "Q. Now, at any time did you ever go to the Oil and Gas Board on your behalf or anybody's behalf and ask to be integrated into the Chatom Unit?
"A. No.
 "Q. Could you tell the jury why you didn't?
"A. Didn't think we could win.
"Q. Didn't think you could win?
"A. That's correct.
 "Q. But you thought you could drill a well and sell that property.
 "A. Well, its only two ways to figure out if there's oil and gas on property. One of them is to drill a well, and [the] other one is to have access to all data available. We couldn't get access to all the data to make the calculations, so we tried to get the well drilled, and failed."
Clearly, the plaintiffs had the opportunity to seek review of the Chatom Unit order, or to petition for inclusion in the Chatom Unit, but failed to do so. To hold Phillips liable for drainage of Sections 19 and 30 in these circumstances would run counter to this State's policy regarding secondary recovery unitization. An owner of interests outside a unit should not be entitled to damages from the operator of the unit if the circumstances are such that he can protect himself by engaging in an independent operation, or if he has been extended a fair opportunity to participate in the Unit. See Kuntz, Oil and Gas 4.8 (c) (2d ed. 1987).
We note that the plaintiffs have relied in part on this Courts holding in Sheffield v. Exxon Corp., 424 So.2d 1297 (Ala. 1982), for their argument against Phillips's contention that the plaintiffs' lawsuit is an improper collateral attack and its contention that the plaintiffs failed to exhaust their administrative remedies. That case, which is easily distinguishable from this case, simply held that lessors of a property containing oil and gas may litigate the issue whether the lessees acted as reasonably prudent operators in light of the implied covenant of protection — the covenant that a lessee will do nothing to impair the value of the lease and will use reasonable care to protect the lessor from damage. Whether or not the lessees had violated that implied covenant by improperly draining the lessor's property was a proper- issue for litigation. However, in this present case, there is no similar issue, because there are no findings of breached implied covenants between lessor and lessee, and Phillips held no leases on the plaintiffs' property after 1982. Unlike Sheffield the judgment in this case declares that owners of interests outside a secondary recovery unit may recover for drainage by that unit — a unit in which those interest-owners could have attempted to join, but failed, for whatever reason, to do so.
Because, under the circumstances of this case, this judgment constitutes an impermissible collateral attack on the Board's order creating the Chatom Unit, and because the plaintiffs failed to seek their remedies provided under the statutes governing the Oil and Gas Board, the judgment of the trial court is reversed and a judgment is rendered for Phillips Petroleum Company.
REVERSED AND JUDGMENT RENDERED.
HOOPER, C.J., and MADDOX, ALMON, SHORES, HOUSTON, KENNEDY, and SEE, JJ., concur.
COOK, J., dissents.
[2] The Strykers and the Browns (see note 1) also own interests in property within the Chatom Unit and have received royalties from Phillips for production from their properties within the unit. *Page 592